# CHARLESTON.

Pittsburgh & West Virginia Gas Co. v. The Public Service Commission of West Virginia

(No. 5627)

Submitted February 3, 1926. Decided February 23, 1926.

1. Public Service Commission—*Order Fixing Rates Within Power of Commission Will Not be Disturbed Unless Finding of Fact on Which it is Based is Contrary to or Without Evidence, or There Has Been a Misapplication of Legal Principles; Where Substantial Conflict of Evidence on Question of Fact Exists Probative Value Accorded the Evidence by Commission Will Not be Disturbed.*

An order of the Public Service Commission fixing rates to be charged by a public service utility, within the constitutional and legislative power of the Commission, will not be

disturbed unless it appears that the finding of fact on which the order is based is contrary to evidence, or without evidence, or there has been a misapplication of legal principles; and where there is a substantial conflict of evidence on any question of fact, the probative value accorded by the Commission to such evidence will not be disturbed.   (p. 67.)

(Gas, 28 C. J. § 47.)

2.   RATES—*Burden of Proving a Rate to be Confiscatory is on Public Utility and Unless Evidence is Clear That Rate is Too Low to Afford Reasonable Return on Value of Property Order Fixing it Will Not be Disturbed.*

When a rate fixed by the Commission is attacked as confiscatory, the burden of proving it to be so is upon the public utility, and unless the evidence is clear that the rate is too low to afford a reasonable return on the value of the property used and useful in the service of the public the order fixing the rate will not be disturbed.   (p. 67.)

(Gas, 28 C. J. § 47.)

3.   SAME—*Return of 16.72% to Gas Company on Rate Base Offered and Accepted by Commission Held Not to be Confiscatory.*

A case where a return of 16.72% to a gas company serving the public on a rate base offered and accepted by the Commission for the purpose of fixing rates, is held not to be confiscatory.   (p. 68.)

(Gas, 28 C. J. § 40.)

(NOTE:  Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Petition by Pittsburgh & West Virginia Gas Company for suspension of order of Public Service Commission fixing rates to its Industrial and Domestic consumers.

*Petition dismissed.*

*Conley & Johnson, A. W. Robertson,* and *B. U. McClintock,* for petitioner.

*M. F. Livezey* and *G. W. Ford,* for respondent.

LIVELY, JUDGE:

The Pittsburgh and West Virginia Gas Company, a public utility corporation, complains of an order of the Public Service Commission refusing to complainant a raise in its rates to its industrial and domestic consumers in this state, on the

ground that the rates now in effect are confiscatory.

The application for increase in rates was filed in December of 1924. Protests were interposed by individual consumers and by the City of Grafton; evidence was taken on the part of the applicant, and the Commission caused an audit and report of the books and affairs of the utility to be taken and filed. The case was submitted for decision on June 22, 1925; (briefs were filed in July of that year); and the order denying increased rates was entered November 19, 1925. The rate in effect at the time of the application was 40c per thousand cubic feet, less 2c for prompt payment. The increased rates asked for are 53c per thousand for the first 100,000 cu. ft.; 48c for the next 400,000 cu. ft., and 43c for all gas used above this amount, less 3c for prompt payment, and a minimum meter charge of $1.00 per month. The two classes of consumers are "wholesale" consumers who are charged an average rate of 31.9c, and the "domestic and industrial consumers", the rate being 40c and 38.9c, respectively, to them. The bulk of the wholesale gas sales goes to the Equitable Gas Company, a subsidiary or affiliated company, at the Pennsylvania line, for 32c. (For the year 1925, the Equitable was to pay 37c.) The new rate was to apply to the domestic and industrial consumers in this state.

Complaint is made that the Commission erroneously adopted the rate base of $14,065,421.51 as the value of the property of the utility used and useful in the public service; that the Commission gave no consideration or weight to the utility's evidence to the effect that its income for the year 1925 would (in strong probability) decrease, while its costs of service to the consumer would increase, nor did the Commission give any consideration or weight to its evidence of its present cost of service to its industrial and domestic consumers in West Virginia. The major emphasis is upon the point that the Commission did not consider or give due weight to complainant's evidence as to the estimated net earnings for the year 1925; therefore the findings of the Commission were without evidence to support them and were in direct conflict with the uncontradicted evidence of complainant.

Was the Commission in error in ascertaining $14,065,421.51

as the rate basis? A witness was introduced by the utility who testified that the reproduction cost of the utility's plant new, including going concern value and working capital, less depreciation, was $23,988,137. The utility not desiring a revaluation of its property used and useful in the public service, which involved loss of money and time, stated by its counsel that the evidence of reproduction new value was offered as an index to show the book value was much less than the actual value. "But inasmuch as the proposed increase in rates would not produce a fair return upon the book value, therefore, it was unnecessary to go farther into the real value." The evidence of reproduction value new was put in as persuasive for increased rates on the book value. Neither the applicant nor the Commission then went further to ascertain the actual value, and the case proceeded upon the theory that the book value as claimed by the utility, $14,065,-421.51, was the rate base for the purpose of the application. The Commission accepted the book value contended for, as the rate base, and found in its order, "that the property of the petitioner has the value claimed by it for rate making purposes, that is, $14,065,421.51, and that said valuation must be accepted as the rate base herein." The utility having presented to the Commission the book value as the rate basis, and the incomplete evidence of actual value as an "index", its contention now made in this court that the rate base is not the true one under the evidence and that the Commission was in error in not ascertaining the true basis to be $23,988,137, is not well founded. If it had appeared to the Commission that the utility was contending for a rate base different from the book value, evidence no doubt would have been taken upon the various items of property. Expense and delay would have followed. The utility desired to avoid such delay and expense and by counsel so announced.

As before stated, the main point of error relied upon is the alleged failure of the Commission to consider and accept the evidence of one of the officers of the utility, to the effect that reduced net earnings for the year 1925 would be at least $1,000,000 less than the net earnings for 1924. This loss of revenue was based on estimates of decreased gas sales

and increased expenses for the year 1925. The net earnings for 1924 were estimated by this witness, Hurlburt, to be $1,190,677. This estimate was based on ten months actual operation, coupled with an estimate for the remaining months. The report of Williamson who audited the books after the expiration of the year, showed the net income (depreciation allowed) to be $1,443,643.56, a considerable difference (after adding $94,408.76 net gasoline earnings) between the actual and estimated result. The probative value of estimates is inconsequential when compared with actualities. The Commission had before it a comprehensive history of the utility, its financial operations, purchases, expenses, stock transactions, dividends and depreciations, fluctuations in production and sales, and the like, together with its developed and undeveloped gas territories, all of which could be considered by it in weighing the testimony of decreased sales and increased expenses for the year 1925. These estimates were necessarily speculative. The burden is upon the utility asking for increased rates to prove that they are just and reasonable. *Gas Co.* v. *Public Service Commission,* 95 W. Va. 557. It will be observed that when the case was submitted, nearly one-half of the year 1925 had expired, but there was no effort then made to reduce the estimates formerly submitted, to actual results. The best evidence would have been the decrease in gas sales and increase in costs of production covering the months then expired. The Commission was entitled to the best evidence available. Past experience may always be considered in resolving future probabilities. We cannot say that the Commission acted without evidence; nor can we say that the estimates of decreased sales and increased expenses founded largely upon conjecture should outweigh the actual facts and figures considered by the Commission. While we do not find in the record a written statement by the Commission of its reason for the entry of the order, as contemplated in section 16, chapter 15-O, of the Code, the order recites that the case was heard upon the evidence taken, the schedules filed, the audit and report by Williamson, and the proceedings theretofore had. The courts do not attempt to weigh conflicting evidence in rate cases; and will not inter-

fere with the rates fixed, unless the Commission has acted so
arbitrarily and unjustly as to fix rates contrary to evidence
or without evidence to support them. *Interstate Com. Comm.*
v. *Union Pacific R. R. Co.*, 222 U. S. 541; *Gas Co.* v. *Public
Service Commission*, 73 W. Va. 571. It must be kept in mind
that the fixing of rates is legislative in its character. The
utility may be entitled to increased rates even upon the base
rate presented by it and adopted by the Commission in this
proceeding, if its conjectures for the year 1925 were shown
to be correct by actual experience; and counsel for the Com-
mission in his brief says that the Commission has adopted
a policy of taking care of losses suffered by a utility in fixing
rates for the future. There are recent decisions which hold
it proper to make good losses, suffered under protest, by the
next rate revision. *Penn. Gas Co.* v. *Public Service Commis-
sion of N. Y.*, 211 App. Div. (N. Y.) 253, and many cases
there cited. Complainant is not without remedy before the
Commission.

Another point of error is that the Commission arbitrarily
allocated the rate base and net earnings between the whole-
sale consumers on the one hand, and the industrial and do-
mestic consumers (protestants) on the other, on the basis
of gas sales made to each. It is argued that there is no evi-
dence to justify this allocation; and it is contended that the
rates to the industrial and domestic consumers should be
based on the costs of delivering gas to them as ascertained
and allocated by witness Scharff, according to Scharff's ex-
hibits 1, 2, 3, 4, 5 and 6. The utility operates in northern
West Virginia and owns transmission and distribution lines
of approximately 1,060 miles; the distribution lines being
approximately 60 miles, located chiefly in the City of Grafton
in Taylor County and towns in that vicinity. Its transmis-
sion system extends to Pennsylvania and a large percentage
of its gas is used in and near Pittsburgh. At the Pennsyl-
vania State line it delivers this large percentage of its gas
to the Equitable Gas Company, an affiliated company, the
stock in both companies being held and controlled by a hold-
ing or parent company. We understand that the same in-
terests own and control the entire system, which for con-

venience or business reasons is operated by subsidiary companies. What return from the retail sales of the gas in Pennsylvania is received by the Equitable, or the parent company (Philadelphia company) does not appear. Eighty-five per cent of the gas produced is sold to the affiliated companies and they are denominated the ''wholesale'' consumers, while fifteen per cent is sold to industrial and domestic consumers, largely in and around Grafton, who are on the distribution lines. There are approximately 4800 industrial and domestic consumers who are affected by the proposed increased rates. The Commission fixed the rate base for these industrial and domestic consumers by allocating to them 15% of the entire property and 85% to the wholesale consumers, according to the gas sales of each. The Commission has advanced no reason for this allocation (no opinion being written), but its counsel says this method has appealed to the Commission in this and other cases as being a fair basis of apportionment.

What is the value of the property used and useful for the service of these 4800 consumers? We find no attempt to approximate it. The initial cost values of the distribution lines and equipment are shown to be $198,283.37, and the Commission on the above allocation made the value for rate purposes, $1,600,558.05. Using the book value as the base rate for the entire property the Commission found the net income for 1924 to be $2,351,578.47 (including income from gasoline, $94,408.76,) which gave a return of 16.72% upon the value of the entire property, a profit sufficient to allow 8% on the investment, and 8.72% to take care of amortization, depreciation and depletion; the life of the operation being estimated at 15 years. As before stated, we are not justified in finding a different rate base. The rates now fixed bring in a fair return upon the entire property and are not confiscatory. That was the result in 1924, and sufficient evidence has not been brought before the Commission, in its opinion, to make an increase in rates for 1925. We are not disposed to say the Commission has erred in weighing that evidence. But counsel for the utility, by belated brief, contend that the object of the application was to adjust the rate

schedule so that the domestic consumers would pay some part of the increased costs of serving them. The argument is that the wholesale consuming class is paying an unjust proportion of the present and proposed rates and the domestic and industrial consumers are served at a rate below the actual cost of serving them; therefore the rate now in existence is confiscatory, so far as the latter class is concerned. And the point of error is that the schedule of rates to the two classes of consumers (''wholesale'' and ''domestic and industrial'') should be based on the cost of delivering the gas to them; and that the Commission has wholly ignored the evidence of the studies of cost per thousand cubic feet to the wholesale consumer on the transmission line, and the cost to the latter consumers on the distribution lines, as given by witness Scharff and exemplified by the Scharff exhibits. He has calculated that it costs the utility to deliver to the wholesale consumer at the point of purchase on the transmission line in 1924 (3 months estimated), 31.9c, and to the consumers on the distribution lines, 49.2c. Scharff Ex. No. 1.

The price of gas in 1924 to the domestic and industrial consumers actually averaged 38c to the domestic and 37.92c to the industrial, and to the wholesale consumers, 31.9c. Williamson Ex. No. 17. In that year the total thousand cubic feet of gas sold was 19,635,982, of which 570,335 was delivered to the domestic and 1,266,636 to the industrial, or 1,-836,971 to both, which subtracted from the total sales, leaves 17,799,011 thousand cubic feet sold to the wholesale consumer. According to Scharff, the utility lost, after including depreciation and profit, about 11 cents on every thousand cubic feet of gas sold to the industrial and domestic trade, which loss would be approximately $200,000 (1,836,971 X 11c). The gas sold to the wholesale consumers in 1924 was delivered at a cost of 31.9c, according to Scharff, and the average actual sale price was 31.9c, affording, according to his exhibit No. 1 (on which the cost is based), a profit of $1,194,558. as well as an allowance of $943,506. for depreciation. The actual net earnings from the wholesale were $2,068,940.16; and the actual net earnings from the retail

were $281,638.30, making a total net profit of $2,351,578.46 (this includes about $95,000 gasoline profits.)    It appears that the total revenues were apportioned upon the actual sales.    The expense incident to both wholesale and retail consumers appears to have been allocated to each upon the basis of gas sales; but the expense of distribution was charged against the domestic and industrial consumers and allocated between them.    So, allocating the property used and useful in the entire plant between the wholesale and domestic consumers, and the expense incurred common to both classes, upon the basis of gas sales, apportioning the revenue upon the basis of actual sales, and apportioning the distribution expense to the domestic and industrial business, the Commission has found that the earnings from the industrial and domestic consumers were $281,638.30 or 17.60% upon the rate base allocated to them.    Criticism is made of the Scharff exhibits, on the ground that he has included in "production costs" a depreciation of $456,797; under "transmission costs" a depreciation of $86,425; and in distribution costs a depreciation of $5,089; also in the total costs an "item available for return" of $1,214,158, making a total of $2,162,651, which when eliminated from the cost of supplying "wholesale" and "retail" consumers will reduce the cost to about 20 cents per thousand cubic feet, instead of 31.9c to the wholesale trade, as claimed.    We presume the criticism is on the ground that the depreciation and the item available for return are taken care of by allowing 8% for amortization, depreciation and depletion.    However, actual experience of the utility demonstrates that the study of costs as made in the Scharff exhibits is unsatisfactory.    The actual profit, including $94,408.76 from net gasoline earnings, could not have been realized if they be true.    So, we cannot say the Commission erred in not accepting as controlling the Scharff evidence and exhibits. We cannot substitute our judgment for that of the Commission (composed of experts in such matters) on questions as to what would be for the best interests of the utility and the public served by it.

But we return to the contention that there was an improper allocation of the rate base among the two classes of consumers

on the basis of gas sales, in order to determine the property used and useful in the service of each. We perceive no good reason for condemning this method of allocation. We note that it has been used by other commissions, apparently without criticism. The Kansas Public Utilities Commission said in *Landon* v. *Lawrence,* Pub. Util. Repts. 1916 B, page 331, "The value of property used in transporting and distributing natural gas in two states may be divided upon the basis of use, in the proportion that the volume of gas used in each state, respectively, bears to the entire volume passing through the line." To the same effect are *Davis* v. *Pennsylvania Gas Co.,* Pub. Util. Repts. 1921 B, page 342; *Re United Fuel Gas Co.* (W. Va.) Pub. Util. Repts. 1918 C, page 193 and page 232; *Re Hope Natural Gas Co.* (W. Va.) Pub. Util. Repts. 1921 E, page 418, syl. 9.

The view we have taken of this application for "appeal" from the Commission's order is that the evidence of a greater rate base than $14,065,421.51 is not sufficient for us to say that the Commission erred in adopting that base; that if the actual experience of the utility for the year 1925, corroborated its estimates for losses in that year occasioned by decreased sales and increased costs, it has a speedy remedy under the Commission's ruling that a deficit may be met by increased future rates; and that upon the rate base fixed the utility has received a net income sufficient to refute the claim of confiscation.

Confiscation is the basis of the application for reversal of the order, and we have examined the evidence on which the finding of fact is based, to ascertain if there has been a misinterpretation of legal principles or a mistake as to the evidence, or no evidence on which to base the findings; all for the purpose of ascertaining if the rates prescribed are so inadequate as to amount to confiscation. Whether there has been a discrimination between the two classes of consumers is not a question which is to be considered in determining whether the property of the utility is being confiscated for public use; and our examination of the evidence relative to the claim of inequality in rates between the two classes of consumers, and the method and procedure of the Commis-

sion in arriving at its rates in that respect, has been somewhat cursory. A utility of this character may classify its consumers and charge different rates according to the service rendered, based upon the varying costs for that service; all subject to the control and supervision of the Public Service Commission, which may adjust rates to them as may to it seem just and proper. Rate making is the exercise of legislative power, and where there are disputed facts and the Commission (the legislative authority) acts upon disputed facts, its action will not ordinarily be reversed by the courts, unless its conclusions are reached by applying wrong legal principles to facts clearly disclosed. In determining whether the rates are confiscatory the courts will review the evidence to see if the Commission has based its finding of fact upon a mistake of the evidence or without evidence.

Another point of error is that the Commission refused to allow a fixed minimum charge of $1.00 per month on each meter installed, to be made against the consumer. The difference in revenue, had this been done, is concededly meager. The practical result would be so inconsiderable if the permission had been granted, that we do not deem it important to discuss it.

Our conclusion is to refuse to reverse the order of the Commission, and to dismiss the application for "appeal".

*Petition dismissed.*