MARY ANN BILLINGS

*v.*

CIVIL SERVICE COMMISSION OF WEST VIRGINIA
AND JOHN R. BARBER, *Acting Alcohol Beverage
Control Commissioner*

(No. 13007)

Submitted January 14, 1971.     Decided February 2, 1971.

*Burton & Burton, Walter W. Burton,* for appellant.

*Chauncey H. Browning, Jr.,* Attorney General, *Dennis R.
Vaughan, Jr.,* Assistant Attorney General, for appellees.

BROWNING, JUDGE:

This case is a statutory appeal from a final order of the
Civil Service Commission of the State of West Virginia dated
August 10, 1970.

The appellant, Mary Ann Billings, was employed by the
West Virginia Alcohol Beverage Control Commissioner as a
clerk, having begun her employment on September 23, 1963.
On September 12, 1969, appellant took a leave of absence for
pregnancy and was asbent for four weeks. When she returned
to work, her division director informed her that "she would
have to train someone else and she would be terminated and
that the reason for this termination was political." Claiming

that political discrimination became "so bad," she did not return to work after October 30, 1969. She was never given any reasons in writing for her "termination," the Commissioner taking the position that she resigned rather than having been discharged. Appellant testified that at the time she did not believe she was covered by the Civil Service System and thus did not appeal her "dismissal" within the thirty-day statutory period.

Prior to all of this, but during appellant's employment, Governor Hulett C. Smith, by executive order dated January 11, 1969, placed Alcohol Beverage Control Commissioner employees under the West Virginia Civil Service System. On July 14, 1969, Governor Arch A. Moore, Jr., by executive order, attempted to remove those employees from the protection of the system. On March 30, 1970, this Court, in *State ex rel. Karnes v. Dadisman,* 153 W.Va. 771, 172 S.E.2d 561 (1970), held Governor Moore's executive order to be void for reasons set forth in that opinion. On June 30, 1970, this Court, in *State ex rel. Clark v. Dadisman,* 154 W.Va. 340, 175 S.E.2d 422 (1970), held, *inter alia,* that "terminated" employees were entitled to reinstatement and back pay since they were never legally discharged (not having been given reasons in writing for their discharges).

On July 8, 1970, the appellant herein filed for an appeal with the Civil Service Commission and was granted a hearing to be held on August 10, 1970. On that date, the hearing was held, and the commission entered the order herein complained of. This, in part, was the commission's holding:

> The appeal was not timely and properly made in accordance with, and in compliance with the Statutes of the State of West Virginia, Rules and Regulations of the Civil Service Commission of West Virginia and the decisions of the Supreme Court of Appeals of West Virginia. However, the Commission did hear evidence as to the merits of the case, and it was determined that the employee was not, in fact, discharged, but did, in fact, resign her position as Clerk V with the Alcohol Beverage Control Commission and, therefore, was not appealing from a discharge.

## IV. DECISION

1. Appeal was untimely.

2. The employee resigned and was not discharged. Appeal denied.

We granted an appeal in this case on October 19, 1970, and, upon appellant's motion to reverse, filed December 12, 1970, briefs of counsel and oral argument on January 13, 1971, the case was submitted for decision.

It will be noted that the decision of the commission was based upon two points, the first being that the appeal was untimely. There is pending in this Court for decision the case of *Harris v. Civil Service Commission* and sixteen other cases, all of which by agreement of counsel were consolidated for decision, in which the sole issue is whether there was a timely appeal to the commission. That question will be dealt with extensively in the opinion of the Court when it is handed down, and, in view of the position of the Court upon the second finding of the commission, we do not consider it necessary to discuss the issue of timely filing. In other words, the sole issue we are passing upon in this case is whether or not the employee was "discharged." Of course, if any employee under civil service resigns or "abandons" a position under such circumstances that those terms become synonymous, the commission is without authority to reinstate that employee unless the severance of the employee from his or her position was under such circumstances that it violated Code, Chapter 29, Article 6, as amended, the subject of which is civil service, and the Rules and Regulations of the Civil Service Commission. Although not raised in brief or argument by counsel for either of the parties in this case, we deem it necessary to determine what weight, if any, should be given to a finding of fact by the Civil Service Commission.

Code, 29-6-13, as amended, empowers the commission to take evidence and to pass upon that evidence affirming or reversing the decision of the employing authority, therefore, in our opinion, placing it certainly in the position of an

administrative agency whose finding of fact will not be reversed by this Court unless clearly wrong.

In this regard, compare West Virginia's Administrative Procedures Act, Chapter 29A, and in particular Article 5, Section 4:

> (g) The [circuit] court may [upon review] affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner . . . have been prejudiced because the administrative findings, inferences, conclusions, decision or order are:
>
>          *   *   *
>
> (5) *Clearly wrong* in view of the reliable, probative and substantial evidence on the whole record . . . . (Emphasis added.)

And, as stated in *Guine v. Civil Service Commission*, 149 W.Va. 461, 141 S.E.2d 364 (1965):

> The principle is well established by the decisions of this Court that an order of an administrative body based upon a finding of facts which is contrary to the evidence, or is not supported by the evidence, or is based upon a mistake of law, will be reversed and set aside by this Court upon review.

Conversely, this Court has recognized that an order of the Public Service Commission "based upon evidence to support it is not subject to judicial interference upon review by this Court." *Atlantic Greyhound Corp. v. Public Service Commission*, 132 W.Va. 650, 54 S.E.2d 169 (1949). See also, *United Fuel Gas Co. v. Public Service Commission*, 143 W.Va. 33, 99 S.E.2d 1 (1957); *Walk v. State Compensation Commissioner*, 134 W.Va. 223, 58 S.E.2d 791 (1950); *Town of Harrisville v. Public Service Commission*, 103 W.Va. 526, 138 S.E. 99 (1927); *City of Huntington v. Public Service Commission*, 101 W.Va. 378, 133 S.E. 144 (1926); *Pittsburgh & West Virginia Gas Co. v. Public Service Commission*, 101 W.Va. 63, 132 S.E. 497 (1926). Upon this authority, we now hold specifically that this Court will not reverse a finding of fact by the Civil Service Commission unless it is contrary to the evidence or is

based upon a mistake of law. In other words, the finding must be clearly wrong to warrant our "judicial interference."

In appraising the evidence in this case, we must consider the situation that prevailed at the time the appellant ceased to be an employee of the Alcohol Beverage Control Commissioner. The present Governor had entered his order removing the employees from that department from civil service protection, and it was therefore assumed by the commissioner and employees of the commissioner, as well as others perhaps, that the executive order of the present Governor was valid. There is no conflict in the evidence, the only witness testifying being Mary Ann Billings, the appellant. It is true that at the end of the hearing an affidavit was submitted by the person who at that time was Alcohol Beverage Control Commissioner to the effect that the records of that department showed that Mrs. Billings had "resigned." However, that, of course, was not conclusive and there was no evidence to contradict the evidence of the appellant that she never at any time submitted a formal resignation nor was she at any time discharged. The real issue then is whether or not she was subject to such discrimination or pressure that she was justified in severing her relationship with the department. Perhaps this opinion would not serve its purpose if there was not some brief quotation from the uncontradicted evidence of Mrs. Billings.

\* \* \*

Q. Were you given any reasons for dismissal in writing or otherwise?

A. No, Sir! There were circumstances concerning my last day at work but I don't know how to explain this exactly but I had been pressured for several weeks to either train someone or else and, so, it got to the point that it was unbearable and I couldn't take it any longer.

Q. So, you resigned?

A. I did not resign. I told them that under the circumstances that I did not feel, since I didn't have any Civil Service protection, that it would do me

any good to stay any longer. So, I didn't write any resignation and they didn't fire me. It was just an understanding.

\* \* \*

Q. \* \* \* Did you make up your mind that you were going to leave and left because of what you considered to be job pressure? Is that what I am to understand?

A. Well, we had a meeting with the Commissioner the afternoon that was my last day and he informed me and also two other employees, one was the Director and one was the Chief Accountant, that the man who was harrassing us which was head of personnel in our Division could not be handled because of politics and that he was put there as a hatchet man and that there wasn't anything that they could do at that time, but they did plan to remove him out of that office which they have done since the time I left because so many employees had trouble with him.

Q. I take it from what you say you were not dismissed, in other words, nobody told you . . .

A. No, nobody told me to go home.

Q. that you were discharged — go home and don't come back? You simply decided that due to the pressures of the job that you couldn't take it.

A. They had put someone, they had put a woman in my Department to be trained for my job.

\* \* \*

Q. And, then you left, as you said, without being told you had to leave or that you were discharged? You left of your own free will.

A. But during the days that I worked during those two weeks, we had to put up with such things as

the Republicans being called out of your office, having their legal meetings downstairs, and I was Supervisor of the Division and was never called in on any of these meetings so I know it didn't pertain to the work. The employees they were calling down were new employees so I know they didn't know what was going on. You had to put up with that all the time, seeing them walk, staying in there with you four or five hours and then go downstairs and report what you were doing and everything you had said. So, this Mr. Miller walked up to me the first morning I came back after having my baby and he asked me if I would train someone for him and I said, "Where do you want me to start?" He wasn't expecting that reaction so he just threw up his hands and he said, "I don't know." So, he turned around and walked out. So, later he called me in and also the Director of the Division was in on this meeting and he said he felt like that if I did not train someone, I would have to go, and that the Commissioner had not said so but if it was up to him, he'd get rid of me in a minute that it was politics and that they didn't want a Democrat handling their payroll.

\* \* \*

A. \* \* \* Mr. Conaty had even told me that he would try to move me over to his office to relieve some of the pressure but the last day I was there he said it would be impossible for some time, that things were looking bad and that if the main office called up, I would have to go, it was just a matter of time.

\* \* \*

Q. But, no one told you you had to leave?

A. No, it was just the everyday pressures that were built up during that two week period knowing

that if I did train someone, I was going and if I refused, I was going anyway.

\* \* \*

## EXAMINATION BY:
## WALTER BURTON

Q. Mrs. Billings, on and prior to the time that you left, did you think that you were being discriminated against with respect to your employment because of political factors?

A. Yes, Sir, I did because I was a Democrat.

Q. And, did, on numerous times, Mr. Miller tell you that?

A. Once Mr. Miller did and several times Mr. Conaty told me that he felt that I was a good worker and that he was going to try to keep me as long as he could. That he was going to try to hide me but that in time that they would fire me.

\* \* \*

It is the view of this Court considering all of the circumstances that have heretofore been related and particularly the statement of Mr. Conaty, the only person who had the authority to discharge her, assuming that she was not under civil service, what transpired between her and some of the members of the opposing party who had recently begun work for the Alcohol Beverage Control Commissioner, their conduct in holding meetings and not inviting her and even the statement by some minor official of the department that he would fire her in a minute if he could even though he had no such authority, that the commission was justified in holding that appellant voluntarily left her employment with the Alcohol Beverage Control Commissioner and was not discharged. Furthermore, the commission was not clearly wrong in holding, upon the facts and considering only her testimony, that the appellant was not entitled to be reinstated to her former

position and be paid her salary from the day she ceased her employment. Therefore, the ruling of the commission is affirmed.

*Affirmed.*