IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2021 Term

_____

No. 19-0907
_____

FILED
**March 26, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

TIMOTHY JARRELL,
Respondent Below, Petitioner

v.

THE CITY OF NITRO, WEST VIRGINIA,
Petitioner Below, Respondent

_____

Appeal from the Circuit Court of Kanawha County
Honorable Louis H. Bloom, Judge
Civil Action No. 19-AA-40

REVERSED AND REMANDED
_____

Submitted: January 13, 2021
Filed:  March 26, 2021

Mark McMillian, Esq.                          John R. Teare, Jr., Esq.
Mark McMillian–Attorney at Law, L.C.          Spilman Thomas & Battle, PLLC
Charleston, West Virginia                     Charleston, West Virginia
Counsel for Petitioner Jarrell                Counsel for Respondent City of Nitro

JUSTICE HUTCHISON delivered the Opinion of the Court.

JUSTICE WOOTON dissents and reserves the right to file a separate opinion.

**SYLLABUS OF THE COURT**

1. "'A final order of the Civil Service Commission based upon a finding of fact will not be reversed by this Court upon appeal unless it is clearly wrong.' Syllabus, *Billings v. Civil Service Commn.*, 154 W. Va. 688, 178 S.E.2d 801 (1971)." Syl. Pt. 1, *Giannini v. Firemen's Civil Serv. Comm'n of Huntington*, 220 W. Va. 59, 640 S.E.2d 122 (2006).

2. "'A final order of a police civil service commission based upon a finding of fact will not be reversed by a circuit court upon appeal unless it is clearly wrong or is based upon a mistake of law.' Syl. Pt. 1, *Appeal of Prezkop*, 154 W. Va. 759, 179 S.E.2d 331 (1971)." Syl. Pt. 2, *Giannini v. Firemen's Civil Serv. Comm'n of Huntington*, 220 W. Va. 59, 640 S.E.2d 122 (2006).

3. "An adjudicative decision of the Correctional Officers' Civil Service Commission should not be overturned by an appellate court unless it was clearly erroneous, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Review under this standard is narrow and the reviewing court looks to the Civil Service Commission's action to determine whether the record reveals that a substantial and rational basis exists for its decision." Syl. Pt. 1, *In re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996).

4. "An appellate court may reverse a decision of the Correctional Officers' Civil Service Commission as clearly wrong or arbitrary or capricious only if the Commission used a misapplication of the law, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the Commission, or offered one that was so implausible that it could not be ascribed to a difference in view or the product of Commission expertise." Syl. Pt. 2, *In re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996).

5. "[A] reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the [lower tribunal's] account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, in part, *In Re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

**HUTCHISON, Justice:**

The petitioner, Timothy Jarrell, appeals the September 6, 2019, order of the Circuit Court of Kanawha County, which reversed and vacated a March 30, 2019, order of the Nitro Police Department Civil Service Commission. The commission had concluded that the petitioner was improperly terminated from his employment as a police officer with the City of Nitro Police Department, but the circuit court decided that the termination was appropriate. After reviewing the parties' written and oral arguments, the appendix record, and the pertinent legal authorities, we conclude that the circuit court impermissibly substituted its judgment for that of the commission, which was the factfinder in this matter. Accordingly, we reverse the circuit court's order and remand this case to the circuit court for entry of an order reinstating the commission's order.

## I.  Facts and Procedural Background

Late on a night in May 2016, Jared Hester was a customer at the Mardi Gras Casino & Resort. After drinking several alcoholic beverages, Mr. Hester went outside of the casino building, sat on a bench, and fell asleep. Casino security employees roused him and advised that he could not sleep on the bench. Mr. Hester attempted to go to his parked car, but casino employees would not allow this because he was intoxicated and they were concerned that he would drive. According to Lisa Smith, the Mardi Gras Director of Security, Mr. Hester acted aggressively, pointed his middle finger at the security staff, used profanity, and called the staff foul names. The casino staff called police.

1

Officers with the City of Nitro Police, including Sergeant Timothy Jarrell (the petitioner herein), responded to the call. Mr. Hester, a North Carolina resident, had not made any arrangements for lodging that night. The officers determined that Mr. Hester was publicly intoxicated and unfit to drive, but they told him that they would not arrest him if he would check into a hotel for the night. Mr. Hester ultimately agreed to this plan and accepted a ride in the casino's courtesy van to a Comfort Inn hotel approximately one mile away in Cross Lanes. In a separate vehicle, Sergeant Jarrell followed the courtesy van to the Comfort Inn.

A hotel security video recording[1] shows the van pulling up to the Comfort Inn, Mr. Hester exiting the van and walking toward the lobby doors, and Mr. Hester stopping and standing outside of the hotel. Sergeant Jarrell arrived alone, exited his own vehicle, and stood a few feet away from Mr. Hester. Mr. Hester told Sergeant Jarrell that he was not going to check into the hotel, and that Sergeant Jarrell could not make him do so. Sergeant Jarrell responded that Mr. Hester would be arrested. The video recording lacks audio, but Mr. Hester has admitted that Sergeant Jarrell instructed him to place his hands behind his back and to stop resisting arrest. The video shows that Mr. Hester did not put his hands behind his back, and instead crossed his arms in front of himself. After their short discussion, Sergeant Jarrell approached Mr. Hester and, in the process of arresting him,

_____

[1] The video is black and white, has low resolution, and lacks audio, and the camera was some distance away from Mr. Hester and Officer Jarrell. Nonetheless, the two men can be seen on the recording.

2

performed a "lateral carotid restraint."[2] Specifically, the sergeant placed his arm around Mr. Hester's neck, briefly disrupting blood circulation and rendering Hester partially or fully unconscious. Sergeant Jarrell lowered Mr. Hester to the ground. Mr. Hester regained consciousness a few moments later, and other officers arrived at the Comfort Inn. The officers arrested Mr. Hester and charged him with public intoxication and resisting an officer; these charges were later dismissed with prejudice.

The City of Nitro (respondent herein), along with the Kanawha County Sheriff's Department, investigated to determine whether Sergeant Jarrell had acted inappropriately and used excessive force in his arrest of Mr. Hester. Sergeant Jarrell was placed on paid administrative leave and was subsequently indicted for battery and false swearing. However, at a December 2017 trial, a magistrate court jury acquitted Sergeant Jarrell of all charges.

Meanwhile, by letter dated October 19, 2017, Nitro Police Chief Robert Eggleston terminated Sergeant Jarrell's employment with the Nitro Police Department based upon his actions during the Hester arrest. Sergeant Jarrell demanded a review by an internal department hearing board, which found that he should *not* have been terminated.

---

[2] The parties and the record also refer to this maneuver as a "lateral vascular restraint" or a "choke hold."

3

Chief Eggleston and the City of Nitro then appealed to the Nitro Police Department Civil

Service Commission, which held a *de novo* evidentiary hearing in February 2019.[3]

---

[3] The police civil service commission hearings process is set forth in West Virginia Code § 8-14-20 (1996), providing, in part:

(a) No member of any paid police department subject to the civil service provisions of this article may be removed, discharged, suspended or reduced in rank or pay except for just cause, which may not be religious or political, except as provided in section nineteen of this article; and no such member may be removed, discharged, suspended or reduced in rank or pay except as provided by the civil service provisions of this article, and in no event until the member has been furnished with a written statement of the reasons for the action. In every case of such removal, discharge, suspension or reduction, a copy of the statement of reasons therefor and of the written answer thereto, if the member desires to file such written answer, shall be furnished to the policemen's civil service commission and entered upon its records. If the member demands it, the commission shall grant a public hearing, which hearing shall be held within a period of ten days from the filing of the charges in writing or the written answer thereto, whichever shall last occur. At the hearing, the burden shall be upon the removing, discharging, suspending or reducing officer, hereinafter in this section referred to as "removing officer", to show just cause for his or her action, and in the event the removing officer fails to show just cause for the action before the commission, then the member shall be reinstated with full pay, forthwith and without any additional order, for the entire period during which the member may have been prevented from performing his or her usual employment, and no charges may be officially recorded against the member's record. The member, if reinstated or exonerated, shall, if represented by legal counsel, be awarded reasonable attorney fees to be determined by the commission and paid by the governing body. A written record of all testimony taken at the hearing shall be kept and preserved by the commission, which record shall be sealed and not be open to public

4

During the commission's hearing, Sergeant Jarrell narrated the events shown on the hotel security video to explain why he used a lateral carotid restraint. He testified that after Mr. Hester changed his mind and refused to check in to the Comfort Inn, the sergeant informed him that he could not "wander the streets intoxicated at your level" and their "discussion [grew] more heated." The sergeant testified that he instructed Mr. Hester to "[t]urn around, put your hands behind your back. You're under arrest. I'm tired of fooling with you" but Hester responded that he was "not going to jail." The sergeant testified that he stepped closer to Mr. Hester, who was "clinching [sic] his fist." Based on his experience in law enforcement, Sergeant Jarrell was concerned that Mr. Hester was about to hit him:

> In my mind, he's contemplating swinging at me or hitting me in the face, so he is slightly belated [sic], and he's pumping his fist. So I'm thinking he's left-handed, he's going to swing with his—with his left arm. So that's what I need to watch for.

> But at the same time, I've already told him, "You're under arrest, turn around, put your hands behind your back." I've told him this countless times. I have to get a response. We have to go somewhere from here.

> So I reach out and touch his elbow, and that's all I intend to do at that second, because when he swings at me, I need to be prepared. So in my mind, I think he's going to swing. To my surprise, when I reach out and touch his elbow, he turns away from me.

> So that's the next portion of what we're going to see [on the hotel security video]. So you see my left hand on his—on him. So if I can back up just slightly—I don't know where that

inspection unless an appeal is taken from the action of the commission.

5

put me. As I reach out to touch, prior to him turning—if I can correct myself, prior to him turning, I grab, go to pull, and he pulls away from me.

So at that point, that's what happens right here [referring to the video]. So when he pulls away, turns his back towards me, is what we're about to see. I step closer, you see me touch the elbow, grab him, he turns away. . . .

So at this position, if you trust me sir, we're here. [Witness demonstrates move on another person in the commission's hearing room.] Now, this is not a choke. You can talk, you can do anything, you can eat a sandwich, whatever he'd like to do.

From here, I'm standing behind him. I'm relatively safe here. He could—he would have a hard time to, you know, to assault me easily. So from here, I'm telling him, "Stop, stop, stop, stop." That's what I said. That's exactly what I said, "Stop, stop, stop, stop."

He doesn't, and where things get much more dangerous, he's a very, very strong man. He's extremely strong. From this position, he's here. He just leans forward. Now, Mr.—there we go. So my feet, my heels start to come up off the ground.

It's not super pronounced in this video, but when I'm holding him here, just telling him to stop, there's no choking. There's no constriction of any airway, nothing. He starts to lean forward, and I think, "I'm going to get flipped right over his back. I'm going to land on my head on the concrete."

So at that point is when I used a carotid restraint. . . .

. . . [When] my feet start[ed] to come up, the only way that I can change that is to get him back standing more direct and to use a carotid restraint. That's what I had to do.

The sergeant testified that he carefully lowered Mr. Hester to the ground, and Hester regained full consciousness a few seconds later. In response to further questioning, Sergeant Jarrell testified that alternative techniques, such as using other means of physical

6

force to overtake Mr. Hester, sweeping Mr. Hester's legs, or using a taser or stun gun, might have been effective but posed a greater risk of harm to the intoxicated Mr. Hester because he would have fallen to the concrete sidewalk in an uncontrolled manner.

In his pre-recorded testimony,[4] Mr. Hester acknowledged that he was intoxicated and had refused to check into the hotel. He admitted that Sergeant Jarrell instructed him to put his hands behind his back, but he could not remember whether he did so.[5] Mr. Hester testified that he did not move during the arrest. When asked whether he had resisted arrest, Mr. Hester testified "although I don't remember a hundred percent, I don't believe that I would have[.]"

The city presented testimony from its City Attorney, Johnnie Brown, who had given a training session to city police officers—including Sergeant Jarrell—just a few weeks before this arrest. Mr. Brown testified that during the training, he explained the continuum of force that police officers must follow; essentially, the more dangerous a situation is to the officer or another person, the more force that the officer may employ. The department's policy manual at the time prohibited "[a]ny use of force not reasonably

---

[4] Some of the testimony at the commission's hearing was presented by live witnesses, while some was pre-recorded testimony from the magistrate court trial. The city presented Mr. Hester's testimony via prior recording.

[5] Although the camera was positioned some distance away, the video shows that Mr. Hester did not put his hands behind his back.

necessary in light of the circumstances confronting the officer." During the training and again during the commission's hearing, Mr. Brown gave his legal opinion that the use of a lateral carotid restraint is only appropriate in situations that would justify a police officer's use of deadly force. However, Sergeant Jarrell and his witnesses opined that the technique is safe when properly applied by a person who is trained in the technique, and that it is appropriate for use in less dangerous situations. There was evidence presented during the hearing that Sergeant Jarrell had been trained in the use of this technique.[6]

In a police civil service commission proceeding, the employer has the burden of proving just cause for the discharge of an officer.[7] After considering the evidence, the commission concluded that the City of Nitro and Chief Eggleston had not met the burden of showing just cause for terminating Sergeant Jarrell's employment. The commission found that Mr. Hester's public intoxication and disorderly conduct at the casino justified his arrest; that Sergeant Jarrell had attempted to handcuff Mr. Hester, who is "a larger man of superior size and perceived strength," but Mr. Hester resisted; that Sergeant Jarrell

---

[6] After the events herein, the Nitro Police Department's policy manual was revised to expressly limit the use of the lateral carotid restraint. In addition, in March 2016 the Legislature passed West Virginia Code § 61-2-9d (2016, amended in 2020), criminalizing the knowing and willful restriction of another person's blood flow by application of pressure on the neck or throat. However, West Virginia Code § 61-2-9d did not take effect until June 3, 2016, which is the month after Mr. Hester's arrest. Because the revised policy manual and the new statute were not in effect at the time of this arrest, they are not applicable to our decision.

[7] *See* W. Va. Code § 8-14-20(a), quoted *supra* n.3.

reasonably perceived the threat of receiving serious injury if Mr. Hester was not brought quickly under control; that Sergeant Jarrell was qualified to safely perform a lateral carotid restraint; and that the lateral carotid restraint was within the use of force continuum and was reasonable under these circumstances. Accordingly, in its March 30, 2019, "Decision Order," the commission ordered that Sergeant Jarrell be reinstated to his employment with full back pay.[8]

The city appealed the commission's order to circuit court. Without holding a hearing, the circuit court reversed the commission's decision by final order entered on September 6, 2019. The focus of the circuit court's order was the court's independent review of the hotel security video. The court saw no indication from the video that Mr. Hester had "pumped his fist," leaned forward, or otherwise actively resisted arrest. At most, the court observed what it termed "passive resistance" when Mr. Hester refused to put his hands behind his back.[9] The court concluded that Sergeant Jarrell's use of the lateral carotid

---

[8] Sergeant Jarrell also had an unrelated employment issue pending before the commission regarding his requested promotion to lieutenant. The commission had previously ruled that he was eligible and should have been promoted to a vacant lieutenant position, but the matter was held in abeyance pending the disposition of this discharge case. Accordingly, in addition to ordering reinstatement and back pay, the commission's March 30, 2019, order directed that Sergeant Jarrell be advanced to the rank of lieutenant *nunc pro tunc*.

[9] The circuit court also found that the commission had mischaracterized part of Mr. Hester's testimony. When asked if he had "engage[d] in any physical altercation" with the sergeant, Mr. Hester had responded "well, yes." However, the circuit court found that Mr. Hester was only referring to the physical actions taken by the officer; elsewhere in his testimony, Mr. Hester had denied resisting arrest.

9

restraint was excessive in light of the circumstances, and directed that the commission's order overturning the termination be vacated. Sergeant Jarrell now appeals the circuit court's order to this Court.

## II. Standard of Review

The well-settled standard of review in police civil service commission appeals requires courts to give deference to the commission's factual findings. "'A final order of the Civil Service Commission based upon a finding of fact will not be reversed by this Court upon appeal unless it is clearly wrong.' Syllabus, *Billings v. Civil Service Commn.*, 154 W. Va. 688, 178 S.E.2d 801 (1971)." Syl. Pt. 1, *Giannini v. Firemen's Civil Serv. Comm'n of Huntington*, 220 W. Va. 59, 640 S.E.2d 122 (2006). Similarly, "'[a] final order of a police civil service commission based upon a finding of fact will not be reversed by a circuit court upon appeal unless it is clearly wrong or is based upon a mistake of law.' Syl. Pt. 1, *Appeal of Prezkop*, 154 W. Va. 759, 179 S.E.2d 331 (1971)." Syl. Pt. 2, *Giannini*. To the extent that "the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 3, *Alden v. Harpers Ferry Police Civ. Serv. Comm'n*, 209 W. Va. 83, 543 S.E.2d 364 (2001) (internal quotation marks and citation omitted).

The same standards of review apply to correctional officer civil service commission appeals, which this Court explained in syllabus points one and two of *In re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996), as follows:

10

1. An adjudicative decision of the Correctional Officers' Civil Service Commission should not be overturned by an appellate court unless it was clearly erroneous, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Review under this standard is narrow and the reviewing court looks to the Civil Service Commission's action to determine whether the record reveals that a substantial and rational basis exists for its decision.

2. An appellate court may reverse a decision of the Correctional Officers' Civil Service Commission as clearly wrong or arbitrary or capricious only if the Commission used a misapplication of the law, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the Commission, or offered one that was so implausible that it could not be ascribed to a difference in view or the product of Commission expertise.

With this in mind, we turn to the parties' arguments.

### III.  Discussion

Sergeant Jarrell argues that the commission's reinstatement order was based upon substantial evidence and the circuit court erred by essentially conducting a *de novo* review of the record and substituting its judgment for that of the commission. He argues that his use of force was objectively reasonable in light of the circumstances and potential risk of harm. The city responds that the circuit court correctly reversed the commission's order because it was objectively unreasonable for the sergeant to have used a lateral carotid restraint on a "non-combative misdemeanor suspect."

As the parties recognize, an "objectively reasonable" test applies when evaluating a claim of excessive force by a police officer:

11

An objective reasonableness standard is used to assess whether an officer's actions are excessive, that is, "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *City of Saint Albans v. Botkins*, 228 W. Va. 393, 399 n. 16, 719 S.E.2d 863, 869 n. 16 (2011) (quoting *Graham* [*v. Connor*], 490 U.S. [386] at 397, 109 S.Ct. 1865 [1989]).

The proper application of the objective reasonableness standard in an excessive force case "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. The United States Supreme Court recently offered a more extensive list of things to consider when weighing the objective reasonableness of an officer's actions, emphasizing that the list was not exclusive:

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. We do not consider this list to be exclusive. We mention these factors only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force.

*Kingsley* [*v. Hendrickson*, 576 U.S. 389, 397], 135 S.Ct. [2466] at 2473[(2015)] (citation omitted).

*Maston v. Wagner,* 236 W. Va. 488, 504, 781 S.E.2d 936, 952 (2015). The determination of the reasonableness of force "'is not capable of precise definition or mechanical

12

application.' *State v. Lacy*, 196 W. Va. 104, 117, 468 S.E.2d 719, 732 (1996) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. at 1865)." *Maston*, 236 W. Va. at 504, 781 S.E.2d at 952. "There are no per se rules[,]" rather, the factfinder "must still slosh [its] way through the factbound morass of 'reasonableness.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)).

Critically, it was the commission's job to "slosh" through the evidence in this case and to make findings of fact regarding the potential risk of harm that Sergeant Jarrell faced when arresting Mr. Hester. The commission held an evidentiary hearing and was in the best position to decide what happened, as well as to make determinations regarding witness credibility.[10] On appeal, "a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the [lower tribunal's] account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, in part, *In Re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996). "[I]f the Commission's findings are based on its assessment of the credibility of witnesses and if adequately explained and supported by the record, the findings will not be overturned

---

[10] *See*, *e.g.*, *Sims v. Miller*, 227 W. Va. 395, 402, 709 S.E.2d 750, 757 (2011) ("the hearing examiner who observed the witness testimony is in the best position to make credibility judgments."); *Stephen L.H. v. Sherry L.H.*, 195 W. Va. 384, 395, 465 S.E.2d 841, 852 (1995) (superceded by statute on other grounds) ("There are many critical aspects of an evidentiary hearing which cannot be reduced to writing and placed in a record, e.g., the demeanor of witnesses. These factors may affect the mind of a trier of fact in forming an opinion as to the weight of the evidence and the character and credibility of the witnesses.").

unless they are hopelessly incredible or they flatly contradict either the law of nature or undisputed documentary evidence." *Queen*, 196 W. Va. at 447, 473 S.E.2d at 488.

The disposition of this appeal turns on the facts of the case—there are no disputed issues of law or statutory interpretation—and the commission found Sergeant Jarrell's recitation of the events to be credible. He was the only police officer present at the Comfort Inn and was in the process of arresting a man who had behaved aggressively toward casino security staff just a few minutes earlier. It is undisputed that Mr. Hester was publicly intoxicated, refused to obtain lodging for the night, and refused to put his hands behind his back. Sergeant Jarrell and the other officers had already tried to mitigate the situation by allowing Mr. Hester the opportunity to "sleep it off" in a hotel, but Mr. Hester refused this opportunity. Sergeant Jarrell testified that he saw Mr. Hester clench his fist and that Mr. Hester leaned forward causing the sergeant's heels to start coming off the ground. The sergeant testified that Mr. Hester was a large, strong man, and the sergeant feared being thrown to the concrete. Given this testimony, the commission found that it was objectively reasonable for the officer to have employed a lateral carotid restraint.

Based upon its own independent review of the security video, the circuit court doubted the veracity of some of the sergeant's testimony and concluded that the threat of harm was too low to use this type of force. However, it is impossible to see on the video whether Mr. Hester did or did not clench his fingers into a fist, and it is impossible to see on the video whether or not Sergeant Jarrell's heels were lifted off of the ground. The

14

camera was simply too far away, and the video's resolution is too low, for this to be determined. Moreover, the video lacks any audio, so the court could not have heard the discussion between the two men in order to evaluate whether it was growing more heated, as Sergeant Jarrell testified. Although Mr. Hester denied that he moved during the arrest, he was intoxicated and admits that he cannot recall everything that happened. Critically, at the time of this arrest, there was no statute or department policy that expressly prohibited the use of the lateral carotid restraint. Changes to the Nitro Police Department's policy manual and to state law went into effect after these events.[11] Given the particular facts and circumstances of this case, we find that the commission's findings were plausible in light of the record viewed in its entirety and were therefore not clearly wrong.

We recognize that the circuit court's concern about the use of force during this arrest was not without basis. Indeed, had this Court been the finder of fact, we might have ruled differently than the commission. However, when acting as an appellate reviewer, neither the circuit court nor this Court can overturn findings of fact simply because we would have decided differently. *See* Syl. Pt. 1, *Tiffany Marie S.* Accordingly, we conclude that it was error for the circuit court to have reversed and vacated the

---

[11] *See supra*, n. 6.

commission's order. We reverse the circuit court's September 6, 2019, order and remand this case with directions for the circuit court to reinstate the commission's order.[12]

## IV. Conclusion

For the foregoing reasons, the circuit court's September 6, 2019, final order is reversed. The case is remanded to the circuit court for entry of an order reinstating the commission's March 30, 2019, final order.

Reversed and Remanded with Directions.

---

[12] In his second assignment of error, Sergeant Jarrell seems to be asking this Court to declare that the lateral carotid restraint technique is a safe and appropriate maneuver for police officers to use in situations requiring the use of less-than-deadly force. We decline to address this request. We merely conclude that under the particular facts of this case, and pursuant to the law and policy in effect at the time, the circuit court erred in substituting its judgment for that of the commission on the fact-based question of whether the use of force was objectively reasonable.