In The Matter Of The Appeal of
Officer Leonard A. Prezkop to Wheeling
City Manager Charges of January 19, 1968

(No. 12992)

Submitted February 2, 1971.     Decided February 23, 1971.

*Goodwin, Mead & Goodwin, Thomas A. Goodwin,* for Leonard A. Prezkop.

*George G. Bailey,* City Attorney, *George B. Vieweg, III,* Assistant City Attorney, for City of Wheeling.

BROWNING, JUDGE:

This is an appeal from a final order of the Ohio County Circuit Court sustaining the action of the Police Civil Service Commission and the City Manager of the City of Wheeling dismissing appellant, Leonard A. Prezkop, after approximately fourteen years' service as a police officer for the City of Wheeling.

The case arose in the following manner: On December 31, 1967, about 4:00 a.m., Prezkop and another officer, Willard

Jarrett, arrived at the scene of a fire in an area which they were patrolling. The fire resulted in the deaths of seven young children, with only one eleven-month-old child being rescued, apparently by Carol Botteri, a baby sitter. The two officers made an investigation, and, after completing their tour of duty, they submitted a written report concerning the fire. This report, known as the "green sheet," along with two copies was typed by Jarrett. The green sheet was given to the desk sergeant, and Jarrett and Prezkop each kept a copy. Based on their investigation, the two officers also filed a "complaint-offense" report which read:

> Because of the deaths of 7 inocent [sic] children as the Result [sic] of as we feel negligence on the Part [sic] of Parents [sic] of the dead children. We officer [sic] Jettett [sic] and Prezkop will file charges of child neglect 1/2/68.

Around noon on December 31st, the desk sergeant marked the green sheet "CONFIDENTIAL DO NOT RELEASE."

On the morning of January 2, 1968, Jarrett gave his copy of the report to a lieutenant in the detective division of the department. Prezkop retained his, and later that day showed it to Charles Calloway, a Wheeling newspaper reporter. Jarrett testified that also on that or the following day he saw Prezkop's copy in Prezkop's home. Several days later, Prezkop approached Don Daniels, another reporter, and discussed the possibility of "criminal neglect" in connection with the fire. On January 11, 1968, after having visited Daniels at his home, Prezkop urged Jarrett to sign an affidavit with respect to their investigation, which the pair did at Daniels' office. Still later, Prezkop showed his copy of the report to another reporter.

On January 16, 1968, Daniels wrote a newspaper story about the fire which included a statement that the fire chief had shown him the report "but a carbon copy was already in the hands of the [newspaper]." Also on that day, Jarrett gave a written statement to the chief of police regarding his involvement in the newspaper story. The next day, Prezkop did the same, and Daniels gave the chief of police a copy of the affidavit executed by Prezkop and Jarrett.

The justification advanced for the conduct of Prezkop and Jarrett in this matter apparently was their impression, after talking to the prosecutor, that "no criminal charges would be preferred concerning the children's deaths," and, thus, they "acted in concert and in good faith . . . to bring to justice the persons who might be responsible." The department maintained that Prezkop never asked for or received permission to issue any information relating to the fire, and, in particular, to release the confidential police report (or green sheet). Prezkop maintained that this report was available to the news media after it was filed and before it was marked "confidential," and furthermore no "substantial" reason was given for its being so marked.

On January 19, 1968, the chief of police filed charges against Prezkop with the city manager alleging that Prezkop had violated the Rules and Regulations of the Wheeling Police Department and recommended his dismissal. In particular, he was charged with violating the following sections of those Rules and Regulations:

Section 55. *To Give Information.*

He will answer all questions relating to general information carefully, courteously, and accurately. He shall not, however, furnish information relative to questions of Departmental policy, or that which may in any way react to the detriment of the Department and its functions but will respectfully refer such questions to the office of the Chief of Police.

Section 73. *Not to Impart Official Business.*

A member will treat as confidential, the official business of the Department. He will not impart it to anyone except those for whom it is intended, or as directed by his Commanding Officer, or under due process of law. A Commanding Officer may impart to representatives of the press, upon establishing their identity, current news, providing the ends of justice are not thereby defeated.

Section 94. *Privacy of Department Records.*

No person shall have access to Department records except Commanding Officers and members and employees of the Department in charge thereof or at work thereon. No person whatever shall give or make

a transcript from Department records nor permit any such record to be removed from the Record Bureau except by authority or permission of the Chief of Police or under the process of law.

In addition, on that date Prezkop received a letter of dismissal, and Jarrett was notified that he had been suspended for fifteen days.

Upon a hearing, the Police Civil Service Commission of the City of Wheeling sustained the action of the city manager in dismissing appellant from the department, and, upon appeal, the action of the Police Civil Service Commission was affirmed by the Ohio County Circuit Court by order entered October 29, 1969. It is from this order that Prezkop appeals.

Appellant assigns the court's affirming the Police Civil Service Commission ruling as error because, according to appellant, "[t]he evidence clearly shows that the information which the [appellant] gave to the news media was not confidential . . . " and, furthermore, it was not "so classified immediately after the incident and . . . had been available to all members of the news media and even to the reporter who eventually disclosed its contents . . . ." Additionally, appellant maintains that his dismissal was "not justified in light of his intentions . . . , the loss which he will suffer in losing his employment and . . . pension . . . ," and "the penalty assessed against [Jarrett] who acted in the same manner . . . ."

This Court granted appellant's petition for an appeal on July 14, 1970, and the case was submitted for decision on February 2, 1971, upon briefs and oral argument of counsel for both parties and appellant's motion to reverse filed January 4, 1971.

Under the provisions of Code, Chapter 8, Article 14, Sections 6-23, as amended, when an employee covered by police civil service is discharged, he may appeal such action by the employing authority to the police civil service commission of his city by demanding a public hearing. Section 20 provides that at such a hearing the burden of proof is upon the employing authority to prove valid grounds for the action taken.

Interestingly enough, Code, 29-6-13, as amended, relating to a hearing before the West Virginia Civil Service Commission where an employee has been discharged, transferred, etc., as provided therein, is silent upon the question as to where the burden of proof lies. It would appear from cases pending or decided in this Court that the West Virginia Civil Service Commission has interpreted that section to mean that the burden of proof is upon the employee to show that he was wrongfully discharged or otherwise discriminated against as provided by the Act. In this case, the Police Civil Service Commission of the City of Wheeling did require the city to offer its evidence at the beginning of the hearing indicating a compliance with the statute as to the burden of proof in such cases.

This Court has never passed upon the question of the weight, if any, that is to be given to the findings of a police civil service commission by the circuit court upon appeal, but in *Billings v. Civil Service Commission,* 154 W.Va. 688, 178 S.E.2d 801 (1971), decided at this term of Court, this Court held that a final order of the West Virginia Civil Service Commission based upon a finding of fact would not be reversed by this Court upon appeal unless it was clearly wrong. The rule was stated conversely in *Guine v. Civil Service Commission,* 149 W.Va. 461, 141 S.E.2d 364 (1965):

> The principle is well established by the decisions of this Court that an order of an administrative body based upon a finding of facts which is contrary to the evidence, or is not supported by the evidence, or is based upon a mistake of law, will be reversed and set aside by this Court upon review.

It is the view of this Court and we so hold that the rule laid down in the *Billings* and *Guine* cases should be applicable also in appeals from a police civil service commission to a circuit court.

It appears from the opinion of the circuit judge, which was made a part of the record, that he based his affirmance of the decision of the commission wholly upon the violation of Rule 73 above quoted. It is contended by counsel for Prezkop that

therefore we may consider only the question of whether Prezkop violated that rule and whether such violation justified his discharge and not any of the other rules which he was informed in writing that he had violated when given notice of his discharge. This Court held in *Wilson v. Hix,* 136 W.Va. 59, 65 S.E.2d 717 (1951), citing *Woodruff v. Gilliam,* 116 W.Va. 101, 179 S.E. 873 (1935), that even though the opinion of the court from which an appeal is taken to this Court is made a part of the record, it merely serves "to point out the specific ground on which the trial court acted." Quoting from *Robertson v. Vandergrift,* 119 W.Va. 219, 193 S.E. 62 (1937), the Court said further that "the opinion itself does not become a finding of the court nor a part of the judgment rendered . . . ." Upon the foregoing authority, we are of the view that in reviewing the judgment of the Circuit Court of Ohio County in affirming the police civil service commission, we are not limited to considering only the violation of Rule 73.

Actually there is not much conflict in the testimony in this case, perhaps the only serious conflict being between the testimony of Willard Jarrett, the officer who was working with Prezkop at the time of the fire, and the Honorable Arch W. Riley, Prosecuting Attorney of Ohio County. Jarrett was called as a witness by both Prezkop and the city, and he testified that he did type the original report following the investigation of the fire on the morning of December 31, made two copies thereof, left one with the Sergeant at the desk and that Prezkop kept one copy and he kept the other copy. This witness further testified that when he returned to duty on January 2, 1968, for the first time after his tour of duty that morning, he gave his copy to Lt. Lucas of the Detective Division of the Wheeling Bureau of Police.

Police Chief Noll testified that he had in his possession the original and one copy of the report of the fire that was typed by Jarrett, having received the copy from Lt. Lucas on January 2, 1968. Chief Noll was asked this question and made the following answer: "Q. Under ordinary circumstances, how many copies are made of those reports? A. Usually three;

one for the record, one for the tab and one for the Detective Division." On further questioning, he stated that the one "for the record" was placed in his official records. He admitted that the green sheet was not marked confidential until "some time after eleven o'clock" on the 31st, several hours after the original was filed with Sergeant Hempelman, who was at the desk at the time it was submitted. He further stated, as did Sergeant Hempelman, that it was the latter who marked it confidential. He further stated that he was advised of the fire about 6:30 in the morning but did not come to the police headquarters until almost noon and that the report was marked confidential when he saw it at that time. He stated, without objection, that he was informed by Hempelman that he had so marked the report at the request of McFadden, the fire chief of the City of Wheeling, and that the chief had told Hempelman that he wanted it so marked so as not to "impair his investigation." He was asked this question and made this answer: "Q. To your knowledge, was he conducting an investigation at that time? A. Yes." This witness also stated that between the time the report was filed and marked confidential, which was a period of five or six hours, the information contained therein would have been available to the press although apparently no newsman saw it during that period. When a newsman did come to the department and asked to see the report, he was refused permission to do so and was informed that the information contained therein had been marked, and was, confidential. This witness was also allowed to testify, without objection, that the contents of that report were the confidential and official business of the department whether the report was marked confidential or not. The evidence of this witness and several of the other officers who testified is not entirely clear as to what types of reports are made available to the press and what types are considered confidential. It would appear, however, that from their testimony it might be concluded that any report which indicated that a crime had been committed, no arrest had been made and further investigation was to be made would be withheld from the press.

The first witness called by the city was Prezkop, whereupon his counsel objected to the city using Prezkop as a witness

upon the ground of constitutional immunity. The commission sustained the objection, and he was not required to testify. In view of the fact that the city prevailed, it is not necessary to further consider the question of whether this was the type of hearing and whether the charges were such that Prezkop could avail himself of constitutional immunity on the ground that what he said might incriminate or tend to incriminate him. Incidentally, Prezkop never testified at any time during the hearing.

In the petition for appeal in this Court, Prezkop alleged that the reason he and Jarrett made their affidavit and gave it to a newspaper reporter, and made other contacts with newsmen regarding the contents of the green sheet, was their suspicion or belief that a crime had been committed resulting in the death of the seven children and that those charged with enforcing the law in the City of Wheeling and Ohio County would not investigate or prosecute those responsible for such crime. How they could have had any such suspicion on the morning of December 31, when they each retained a copy of the green sheet, is not explained by either Prezkop or Jarrett or any other witness. At that time there obviously had been no opportunity to investigate or to make an arrest by any persons other than Prezkop and Jarrett. Of course, if an offense was committed in their presence, it was their duty to make an arrest. If not, and they had sufficient evidence to justify prosecuting one or more persons for child neglect or some other offense, it was their duty to go to a justice of the peace, secure a warrant and make the arrest.

The affidavit of January 11 which Prezkop made and, upon his urging, Jarrett signed producing the sensational January 16 headline in a local paper that "Cops Charge Riley Blocked Probe in Tots' Fire Deaths," as well as the showing by Prezkop of his copy of the green sheet, clearly shows that the officers were aware at that time that the "report of the Bureau of Police had been marked 'confidential' and was not released to the news people." This sentence is also contained in that affidavit: "As far as I know it is still 'confidential.'" It was asserted in that affidavit that Riley, meaning Arch W. Riley,

Prosecuting Attorney of Ohio County, "did intervene when I attempted to file neglect charges." (It will be observed that some of these quotes are in the singular although both Prezkop and Jarrett signed the affidavit, but it is clear from the evidence that Prezkop was the dominant force in giving the information to Daniels and that he persuaded Jarrett to sign the affidavit.) The affidavit and, of course, the story that appeared in the newspaper on the 16th relating to it, further stated that Riley read the police report and said " 'Forget it, you don't have any case.' " He further asserted that Riley stated that "it was all confidential." Jarrett testified that he and Prezkop had a conference with Prosecuting Attorney Riley on January 2, 1968. He stated in answer to a question: "Me and Prezkop got together and came down to see him. We didn't call him. Just came." When asked what Riley informed them about the matter, his answer was, "Said to forget it." He further said: "He told us to forget it and let the Fire Department handle it." He was asked this question: "Did he forbid you to execute any warrant for child neglect against the mothers or baby sitter? A. I don't know, in them words. He said forget it." He was asked if Riley told him ". . . the information you had disclosed to him was confidential and you were not to disclose it to anyone else?" His answer was, "Only one part of it." Then this question and answer followed: "Q. What part was that? A. About a known arsonist, or something like that, they was investigating, or something to that effect." (There was some evidence in the record that an alleged arsonist or some person who was suspected of being an arsonist sat in his parked car near the building while it was burning.)

Prosecuting Attorney Arch W. Riley testified as a witness in the case and, contrary to the testimony of Jarrett, stated that the conference on January 2, 1968, was at his instance and that he called the two officers and had them come to his office to interrogate them. He further stated in answer to a question, "We participated with the Fire Department and the Police Department in that investigation." He further stated as part of his answer to another question: "* * * I asked Jarrett and Prezkop to come in and give me any more facts

they might have which would show neglect, and we discussed the fire and various other things, and I told them that I didn't feel the evidence they had at that time would back up a warrant, and that this case would be investigated, and if we got the evidence, they would be prosecuted." He stated at another point in answer to a question: "* * * I just told them I didn't think we had a case at that time." He was asked if he had examined the report, that is, the green sheet, prior to his meeting with Prezkop and Jarrett, and he answered: "I did that morning [January 2], with Chief Noll." He further stated, in answer to another question: "* * * Inspector Mueller of the Fire Department told me of the publicity over this thing of neglect, which was interfering with the investigation; that people were reluctant to talk and that it was hurting them in getting information, and I told both of them, in front of Mr. Peterson [a reporter], not to release any information to him." He was asked on cross-examination that if, at the time he talked with Prezkop and Jarrett on January 2, he had any "plans to turn the matter over to the Grand Jury . . . ." His answer was: "In the back of my mind there was . . . ." He stated that he did not inform Prezkop and Jarrett of this. He further testified that Mr. Ihlenfeld, an assistant Prosecuting Attorney, was at the scene of the fire. Riley was asked what he did in regard to participating in the investigation of the fire and answered in part: "I interrogated some witnesses. * * * I arranged for funds with the County Court. I paid the firemen's expenses to New York to interrogate witnesses. I set up the interrogation of witnesses in Kentucky—of a witness in Kentucky. Just helped the Fire Department. They were conducting the investigation primarily." When asked if his investigation began after the sensational news story appeared in the newspaper, he stated that "The Botteri girl [the baby-sitter] was interviewed three times here and she was attending school in New York and had to get back and we kept her here in case we would uncover something that would give us reason to get a warrant for an arrest out, but we ran out of excuses and let her go back. McFadden and Mueller and Munas wanted to interrogate her again. That was later. That was after the infamous newspaper article." Then, in answer to a question, he testified that the trip to Kentucky was after

the newspaper article. However, he further stated, "That mother had been interviewed prior to the newspaper article. She was in a state of shock and they felt they could get more information from her at a later date. She had gone to Kentucky to stay with a brother or sister." He was asked this question and made this answer: "Q. Did you in any way tell Prezkop and Jarrett to cease any further investigation of the fire? A. No, I did not." He was then asked if he informed them not to discuss certain information they had about the fire and answered: "To the press. I didn't think, as in any criminal case under investigation, it should be bandied around in the press, because it makes it much harder to investigate." He was asked this question and made this answer: "Q. What was your reason for silencing these officers? A. My reason was that Inspector Mueller told me they were having trouble getting information because of this neglect stuff going over radio and television." He stated that as a result, the Botteri girl and the mothers "became scared." Then he was asked if the police officers were advised not to give out any further information about the alleged arsonist, to which he answered: "Mr. Goodwin, I don't think any criminal charges arising out of the fire, whether they be arson, neglect or anything else, should be discussed until we establish something by thorough investigation. I was merely conveying the wishes of the Fire Department, who headed up the investigation." He stated in answer to a question that there was no reason at all why Jarrett and Prezkop should be prohibited from further investigation of the case. He further testified that the State Fire Marshal's office was consulted about the 4th or 5th of January with regard to making an investigation as to the cause of the fire. Other evidence showed that such an investigation was made, but no definite cause was ever ascertained although two possible causes were suggested, neither of which would have been attributed to the mothers or the Botteri girl inasmuch as their evidence was uncontradicted to the effect that they were asleep at the time the fire started.

Fire Chief McFadden confirmed the testimony to the effect that it was he who called and asked the police department to make the report confidential, and he was asked this question

in that regard and made the following answer: "Q. And for what purpose? A. Because the indication was that there would probably be neglect charges filed against the parents, and as I previously stated, this would hinder our—if the parents became aware of this—would hinder our investigation." The next question was: "How would it hinder your investigation?"; and this was his answer: "Because of the refusal to become involved, as was borne out by our questioning of the Botteri woman. She told us she wasn't going to admit being in that back room, in the kitchen, because it would incriminate her; she would probably go to jail. This was one of the reasons." Mr. Riley was asked these two questions and made the following answers: "Q. Mr. Riley, as proceedings further developed in this matter, an entire investigation was turned over to the Ohio County Grand Jury? A. Yes. Q. Was that done at your request? A. Yes." No indictments were returned.

Counsel for Prezkop, in addition to his contention that the evidence did not warrant the discharge of Prezkop, the decision of the civil service commission and the judgment of the Circuit Court of Ohio County refusing to disturb it, contends that both Prezkop and Jarrett were equally guilty and that the punishment meted out to them was so disproportionate that this Court should reverse the judgment even if it should find that Prezkop had violated one or more of the rules and direct that a lesser penalty such as suspension be inflicted upon Prezkop. He cites some authority from other jurisdictions that courts of last resort have such authority although in no case of this kind has this Court taken such action. It may be that some of the Judges of this Court may feel the firing of Prezkop was too severe a penalty. However, it is the decision of this Court that the evidence clearly reveals that Prezkop was the initiator and primarily responsible for what transpired and that Jarrett was influenced in what he did by Prezkop. Jarrett's action in returning his copy of the green sheet the first day he returned to duty is certainly in his favor.

We have before us a finding by the Police Civil Service Commission of the City of Wheeling which has been affirmed

by an able Judge of the Circuit Court of Ohio County and, in view of the uncontradicted evidence of gross and repeated violations of at least one of the rules of the police department by an officer with fourteen years' experience, it is the view of this Court not to disturb the judgment of the Circuit Court of that county. Therefore, appellant's motion to reverse is denied, and the judgment of the Circuit Court of Ohio County is affirmed.

*Motion to reverse denied.*