290 S.E.2d 244

**Clarence WEAVER**

v.

**Gus SHAFFER, Chairman, Boone County Deputy Sheriff's Civil Service Commission, et al.**

No. 14415.

Supreme Court of Appeals of West Virginia.

Dec. 19, 1980.

Concurring Opinion Jan. 14, 1981.

Dissenting Opinion April 2, 1982.

Caplan, J., dissented and filed opinion.

Miller, J., concurred and filed opinion in which Harshbarger, J., joined.

McGraw, J., dissented and filed opinion.

Boettner, Campbell & Crane and John Boettner, Jr., Charleston, for appellant.

Peter A. Hendricks, Asst. Pros. Atty., Boone County, Madison, Chauncey H. Browning, Jr., Atty. Gen., Marianne Kapinos Hoover, Asst. Atty. Gen., Charleston, for appellees.

NEELY, Chief Justice:

The appellant, Clarence Weaver, challenges a provision of the West Virginia Civil Service for Deputy Sheriffs Act which prohibits political activity on the grounds that the statute is vague and overbroad. The Circuit Court of Kanawha County found that the appellant had engaged in proscribed political activities while a member of the classified civil service and concluded that the challenged statute is not so vague or broad as to be constitutionally infirm. We affirm.[1]

In 1971 our Legislature enacted *W. Va. Code*, 7–14–1 [1971] *et seq.* establishing civil service for deputy sheriffs. The act bars dismissal or reduction in rank for political reasons except that *Code*, 7–14–15(a) [1971] provides in pertinent part that:

> On and after the effective date of this article [July 1, 1971], no deputy sheriff covered by the provisions of this article shall engage in any political activity of any kind, character or nature whatsoever, except to cast his vote at any election or shall act as an election official in any municipal, county or state election. Any deputy sheriff violating the provisions of this section shall have his appointment vacated and shall be removed, in accordance with the pertinent provisions of this section.

The Act provides two methods for removing a deputy sheriff. *Code*, 7–14–13 [1971] allows private citizens to petition the county civil service commission for removal and *Code*, 7–14–17 [1971] provides for removal by the sheriff.

On 1 January 1973, the then recently elected sheriff of Boone County, John Protan, discharged the appellant pursuant to Section 17 for unlawful political activity. Mr. Weaver initially demanded a hearing before the Boone County Civil Service Commission, but later decided to abandon the hearing and seek a writ of mandamus in this Court. This Court denied the writ in *Hall v. Protan*, 156 W.Va. 562, 195 S.E.2d 380 (1973), on the grounds that the facts surrounding the discharge were in dispute and Mr. Weaver had not exhausted his administrative remedies.

A citizens' petition for the appellant's removal was filed on 6 July 1973, again alleging unlawful political activity as the grounds for removal. Hearings were held before the Civil Service Commission from June 1973 through April 1974. On 16 April 1974, the Commission ordered Mr. Weaver dismissed from his position as deputy sheriff finding that the appellant had regularly been present in the campaign headquarters of sheriff candidate Albert Gore during the primary election in the spring of 1972; that he attended at least one political dinner

---

1. This case was originally assigned to another justice but after several attempts at its resolution in a series of decision conferences it was reassigned to this writer in October 1980.

during the campaign; and, that appellant transported and/or distributed campaign literature during the same campaign in support of some candidates who were not definitely identified. Appellant sought review in the Circuit Court of Boone County from which the case was transferred to the Circuit Court of Kanawha County where the findings of the Commission dismissing Mr. Weaver were affirmed. This appeal followed.

## I

■ At the outset, the appellant contends that the findings of the Civil Service Commission are clearly wrong and not supported by the evidence. This assignment is without merit. Ample evidence taken at several hearings supports the Commission's conclusion that Mr. Weaver engaged in political activity by being present in the campaign headquarters of sheriff candidate Gore, attending one political dinner and transporting and/or distributing campaign literature. This Court has held that " '[a] final order of a police civil service commission based upon a finding of fact will not be reversed by a circuit court upon appeal unless it is clearly wrong or is based upon a mistake of law. Point 1, Syllabus, *Appeal of Prezkop*, 154 W.Va. 759, 179 S.E.2d 331 (1971).' Syl. pt. 1, *City of Logan v. Dingess*, 161 W.Va. 473, 242 S.E.2d 473 (1978)." *Scott v. Ernest*, 164 W.Va. 595, 264 S.E.2d 635 (1980).

## II

■ The essence of the appellant's other assignments is that *W. Va. Code*, 7–14–15(a) [1971], denies his constitutional right to free political expression because it is both vague and impermissibly broad in its scope. During the 1960s and 1970s the United States Supreme Court wrestled with the

doctrine of overbreadth. Certainly the cases on this subject are not consistent, but there does appear to be a context specific withdrawal from the Rhadamanthine application of the doctrine in civil service cases. The point of entry to the resolution of the challenge at hand, therefore, is the recognition that there is a legitimate governmental interest in restricting political activities of classified employees. *United States Civil Service Commission v. National Ass'n of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *United Public Workers of America v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Such restrictions are designed to insure advancement based on merit in the governmental service and to protect employees from improper political influence. *Mitchell, supra.* The government, therefore, has an interest in regulating the conduct and speech of its employees that differs significantly from the interest it possesses in regulating conduct and speech of the citizenry in general. *Pickering v. Board of Education, supra.*

Historically the problem which statutes such as *W. Va. Code*, 7–14–15(a) [1971] present is that they are so broadly written that they appear to proscribe activity which is protected by the First Amendment to the *Constitution of the United States* and which, under any set of facts, the government cannot be considered as having a legitimate interest in proscribing. In this regard we do find that *W. Va. Code*, 7–14–15(a) [1971] is overly broad since it would appear to proscribe activities which the Supreme Court of the United States has indicated are protected by the First Amendment even with respect to employees of a classified civil service.[2]

---

**2.** The preeminent statement on this subject is found in *Civil Service Commission v. Letter Carriers, supra*, 413 U.S. at 556, 93 S.Ct. at 2886 where the United States Supreme Court indicates that a government may proscribe "[O]rganizing a political party or club; actively participating in fund-raising activities for a partisan candidate or political party; becoming a partisan candidate for, or campaigning for, an elective public office; actively managing the campaign of a partisan candidate for public office; initiating or circulating a partisan nominating petition or soliciting votes for a partisan candidate for public office; or serving as a delegate, alternate or proxy to a political party convention. . . ." Obviously our statute could be erroneously construed to proscribe more than that allowed.

### III

We must now turn to the remedy which is enjoined upon us by the United States Supreme Court with regard to curing a statute of this type; the issue is whether this statute can be cured by judicial construction or must be struck down in its entirety.

In analyzing Supreme Court authority it is necessary to establish an historical perspective which will lead us to appreciate that in the First Amendment area many holdings are quite context specific. It must be remembered that in the 1960s there was still broad-based, state government supported, militant resistance to Fourteenth Amendment racial equality. Racial equality was indeed inextricably intertwined with problems inherent in wealth discrimination and this led to a confluence of the issue of racial equality with certain issues of social equality (not necessarily related to race) in the area of both civil rights and civil liberties. While the cases which require the strict application of the overbreadth doctrine are not necessarily directly related to efforts towards either racial or social equality, nonetheless, an absolutist interpretation of the First Amendment emerged ineluctably from the judicial mind set of the time.

No effort of judicial imagination is capable of intelligently reconciling the inconsistent precedent generated by the United States Supreme Court in the last twenty years with regard to the overbreadth doctrine. The only reasonable conclusion is that once the Supreme Court began striking broad statutes in highly context specific situations while attempting to sustain their conclusions with general principles, the principles were *per force* applied to other contexts for which they were not originally conceived, which ultimately required a retreat from the principles themselves.[3] This, probably more than anything else, explains the dramatic retreat from overbreadth in *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) since that case is entirely at odds with *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975).[4] For example we find in *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)[5] that persons have standing to attack overly broad statutes even when their own conduct would be properly proscribed under a constitutionally narrow statute; yet, in *Young v. American Mini Theatres, supra*, the Court said, "[i]f the statute's deterrent effect on legitimate expression is not 'both real and substantial,' and if the statute is 'readily subject to a narrowing

3. Justice White relied on the differing levels of overbreadth scrutiny in certain contexts for his analysis in *Broadrick v. Oklahoma*, 413 U.S. 601, 616, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973) where he observed that statutes seeking to regulate political activity in an even-handed manner, "have in the past been subject to a less exacting scrutiny." Similarly in *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Court rejected an overbreadth challenge to the Lloyd-LaFollette Act providing for the discharge of federal civil service employees for "such cause as will promote the efficiency of the service." The Court sustained a statute with comparably broad language in *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) when the Court upheld the Uniform Military Code of Justice provisions which proscribed "conduct unbecoming an officer and a gentleman," and a provision prohibiting "all disorders and neglects to the prejudice of good order and discipline in the armed forces."

4. In *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) the Court held a city ordinance overbroad which

prohibited the exhibition of films containing nudity by drive-in movie theatres when the screen is visible from a public street or place. The next term, in *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) the Court sustained against an overbreadth attack, an ordinance prohibiting operation of any "adult" movie theatre or similar establishment within 1000 feet of any other such establishment. To our eyes one of the few distinctions between these cases is that one covers drive-in theatres while the other covers sit-down theatres. As Justice Stewart noted in his dissent "[i]n short, *Erznoznik* is almost on 'all fours' with this case." *Id.* at 88, 96 S.Ct. at 2461.

5. In *Dombrowski, supra*, the Court invalidated on overbreadth grounds Louisiana's subversive activities and Communist Control Law and Communist Propaganda Control Law. The Court found the statutory definition of a "subversive organization" so broad that constitutionally protected speech was inhibited.

construction by the state courts,' the litigant is not permitted to assert the rights of third parties."

The United States Supreme Court has been increasingly reluctant to apply the overbreadth doctrine since *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973) when the Court stated: "[a]pplication of the overbreadth doctrine in this manner is manifestly strong medicine. It has been employed by the Court sparingly and only as a last resort. Facial overbreadth has not been invoked when a limiting construction has been or could be placed as the challenged statute. [citations omitted]." In the cases after *Young v. American Mini Theatres, supra,* when the Court virtually reversed its prior holdings based on overbreadth analysis, we can find only one instance when the Court used overbreadth to void a statute, *Village of Shaumberg v. Citizens, Etc.,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980),[6] although the Court addressed overbreadth arguments on numerous occasions. In light of the diminished application of overbreadth analysis, we do not feel compelled to apply the doctrine in the case before us.

Instead we are guided by *Letter Carriers, Mitchell,* and *Broadrick* which upheld limitations on political campaigning and management, for as the United States Supreme Court stated in *Elrod v. Burns,* 427 U.S. 347, 371, 96 S.Ct. 2673, 2688, 49 L.Ed.2d 547 (1976), "subordination of these activities was permissible to safeguard the core interests of individual belief and association." In *Elrod,* the Court held that a non-policy making government employee could not be discharged on the basis of his beliefs, because in the opinion of the Court delivered by Justice Brennan and concurred in by Justices White and Marshall "if the First Amendment did not place individual belief and association above political campaigning and management, at least in the setting of public employment, the restraints on these latter activities could not have been judged permissible in *Mitchell*

and *Letter Carriers.*" Thus, in the *Elrod* opinion written by Justice Brennan, a leader in the Warren Court era of overbreadth analysis, the Court validated restrictions upon the political activities of public employees once again.

■ In the final analysis the decision concerning the federal question in the case before us must be based upon the most mechanical application of *stare decisis*: in *Letter Carriers, supra* and *Broadrick, supra,* the two cases exactly on "all fours" factually with the one before us, the Supreme Court has held that civil service statutes may be cured by authoritative, narrowing interpretations. Thus in the case before us, we find that the statute's deterrent effect on legitimate expression is neither real nor substantial and that after today's decision there will be an adequately narrow, authoritative interpretation proscribing only those activities which the Supreme Court has indicated may constitutionally be proscribed in *Letter Carriers, supra.* "As we see it, our task is not to destroy the Act if we can, but to construe it ... so as to comport with constitutional limitations." *Letter Carriers, supra* 413 U.S. at 571, 93 S.Ct. at 2893.

### IV

■ Having disposed of the appellant's federal grounds we must now turn to his claim under *W.Va.Const.,* art. III, § 7, that the statute is defective on State grounds. We have consistently held that the *West Virginia Constitution* is at least as solicitous of individual rights as its federal counterpart, *State ex rel. Daily Mail Publishing Co. v. Smith,* 161 W.Va. 684, 248 S.E.2d 269 (1978), aff'd, 443 U.S. 97 (1979), and we accept the appellant's argument that *W.Va.Code,* 7–14–15(a) [1971] is both vague and overbroad under the *West Virginia Constitution.* In circumstances such as those before us, however, in the last several years this Court has consistently adhered to the "doctrine of the least intru-

---

**6.** In *Schaumberg, supra,* the Court invalidated a village ordinance prohibiting door-to-door solicitations of contributions by charitable organiza-

tions not using at least 75% of their receipts for "charitable purposes."

sive remedy,"[7] an easily understood principle which permits a statute which is unconstitutional on its face to be saved from total destruction by judicial construction. We prefer this approach to a manipulation of procedural rules such as standing. Most appellate courts have recognized in one way or another the problems which can be created for society by striking down for a technical defect a statute which, in general, achieves a worthwhile public goal when there is absolutely no assurance that the Legislature will again pass a similar statute.

Law is a practical scheme designed by practical men to provide a more or less rational and just system of government. That is hardly either a new or a startling conclusion, yet it should be recalled from time to time in order to put a little flesh on the theoretical skeleton of government. The Deputy Sheriffs' Civil Service Act before us consists of numerous provisions, each of which reflects a delicate political compromise in the legislative process. *W. Va. Code*, 7–14–21 [1971], however is the "clinker," since it provides severability. That section says:

If any provision of this article or its application to any person or circumstance is held unconstitutional or invalid, such unconstitutionality or invalidity shall not affect other provisions or applications of this article, and to this end the provisions of this article are hereby declared to be severable.

Now it should not come as any great surprise to the average person that the reasonable proscription of factional or partisan political activity is a *quid pro quo* of civil service protection; otherwise, the statute would have the direct opposite effect of that intended. Were we to strike the proscription on political activity while leaving intact civil service protection, we would then have a classified civil service which is entirely free to participate in the most robust manner in the political process and,

through that process, achieve increases in salary, lavish perquisites, and opulent working conditions through political extortion. Furthermore, all this could be accomplished without the control which forthright spoils system politics exacts by making everyone's job dependent on the successful management of the senior elected officer, in this case the sheriff. Since by the plain language of *Code*, 7–14–21, [1971] severability is mandated in the event that any provision of the article is found unconstitutional, we are enjoined either to save the section proscribing political activity or strike it alone, leaving the job security provisions of the article still in force and effect.

It is here that there is a practical divergence between the theory of democratic government and the mechanics of the legislative process. In theory, upon striking the section proscribing political activity the Legislature should, indeed, rush to re-enact that section in such language that it will sustain constitutional scrutiny. In practice, however, there would be almost no pressure by any organized power group to re-enact the political proscription section; in fact, all of the organized pressure would come from the deputy sheriffs who would grind the legislative process to a purposeful halt in their efforts to preserve their rights to political extortion. This is particularly easy since a legislature is an inherently negative institution designed with the primary purpose in mind of prevention of the passage of bad legislation. While the structure of the institution is highly serviceable in this regard, that same structure presents problems when there is a need to re-enact a statute of the type before us.

Originally the medieval parliaments which were the direct ancestors of our modern legislatures were established not to initiate policy but rather to give or withhold assent from policy made by the King. The purpose of parliament was to restrain

---

7. We originally articulated this doctrine as "least *obtrusive* remedy" in *State ex rel. Harris v. Calendine*, 160 W.Va. 172, 233 S.E.2d 318 (1977); *Waite v. Civil Service Commission*, 161 W.Va. 154, 241 S.E.2d 164 (1977); *State ex rel. Whitman v. Fox*, 160 W.Va. 633, 236 S.E.2d 565 (1977); and, *State ex rel. Alsop v. McCartney*, 159 W.Va. 829, 228 S.E.2d 278 (1977); however, upon closer examination of the linguistics it appears that the word "intrusive" is a more accurate reflection of what our Court means notwithstanding the use of "obtrusive" in prior cases.

other institutions of society—King, powerful nobles, judges, and royal officers—from interfering with the complex matrix of interlocking privileges which were usually referred to as "the traditional rights of the subject." In former times people were more willing than they are today to identify with the forces of conservatism; it is unlikely that any modern political party would echo Simon de Montford's Thirteenth Century political slogan *nolumus leges Anglicae mutare*, traditionally translated, "the laws of England will never change."

Yet people want security in the continuance of their privileged positions as much today as they did in the Middle Ages at the dawn of parliamentary development. The institutional system which gives security in everyone's vested interests, namely the Legislature, also gives everyone else security in his vested interests, and it is for that reason that legislatures have organized themselves in such a way that the most powerful force in the institution is inertia. Furthermore, this observation is not intended in any pejorative sense; in fact, it is a monument to the ingenuity of men and women of government that the design of a legislature is quite successful in frustrating the efforts of most powerful predators of the political jungle to subvert the force of government to their own selfish greed.

It is a purposeful inertia which is the primary mechanism for achieving social protection from powerful predators. Such an engine has as its outstanding virtue that to overcome the inertia requires an act of Herculean human will, and this is seldom achieved by either accident or inattention, but rather only through a legitimate blending of political interests in such a way that new legislation receives general approval. It is through inertia that legislators survive intense political pressure from predators without either losing their jobs or destroying the public weal. The unorganized consumer or taxpayer is usually the beneficiary of the inertia machine since organized predators are seldom balanced in the political process by an equally powerful organization of victims. Inertia is designed to protect victims—taxpayers, consumers, and small businesses.

At the time the Deputy Sheriffs' Civil Service Act was passed there was a unity of interests among the deputy sheriffs themselves, the citizenry seeking a professional, well-trained, continuing law enforcement agency in each county, and the sheriffs, who at the time, could not succeed themselves and wished to provide job security for their appointed employees. The result of the political interaction of all of these forces was a civil service plan which gave each group something important which it wanted while at the same time exacting onerous conditions before conferring the desired benefits. The initiating and lobbying force in the passage of the original statute was the Deputy Sheriffs' Association which provided the pressure to overcome the inherent inertia of the legislative process. If, however, we were to strike the provision proscribing political activity, what comparable political force would organize itself to re-enact a section proscribing political activities? Certainly not the deputy sheriffs, sheriffs eligible for re-election, and political factions affiliated with the incumbent sheriffs and deputy sheriffs who would all be militantly against such re-enactment. The class of persons who will be injured by political participation by deputies is as yet unknown, unknowable, and certainly unorganized. This, in fact, is almost the direct opposite of the factual pattern in the cases during the 1960s where the Supreme Court struck down overbroad statutes circumscribing First Amendment rights.[8] In those cases the victims of evil statutes were unorganized and politically impotent while the proponents were organized; here if the statute

---

8. *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (statute prohibiting opprobrious words or abusive language); *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (which prevented employment of "subversives" in state employment); *United States v. Robel*, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (federal law restricting employment of subversives); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (barratry statute held void); and, *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) (statute requiring teachers to reveal all their associational affiliations).

falls, the victims of the fallen statute are the organized public, while the recipients of the unintentional political bonanza are sufficiently well organized to maintain it in an inherently negative legislative process. In circumstances such as these, sound public policy demands the application of the doctrine of the least intrusive remedy to further the intention of the Legislature and maintain the original political balance.

## V

■ Accordingly, we interpret *W. Va. Code*, 7–14–15(a) [1971] as proscribing only those political activities which the Supreme Court has decided in *Letter Carriers, supra* may constitutionally be proscribed. These include: (1) holding a party office; (2) working at the polls; (3) acting as a party paymaster for other party workers; (4) organizing a political party or club; (5) actively participating in fund-raising activities for a partisan candidate or political party; (6) becoming a partisan candidate for, or campaigning for, an elective public office; (7) actively managing the campaign of a partisan candidate for public office; (8) initiating or circulating a partisan nominating petition or soliciting votes (i.e., campaigning) for a partisan candidate for public office; and (9) serving as a delegate, alternate or a proxy to a political party convention. Since the United States Supreme Court has specifically allowed that in circumstances such as the one before us a narrowing interpretation of a broad statute may permit the statute to be saved, and since we find that under the *West Virginia Constitution* this is a fit occasion for the application of our doctrine of the least intrusive remedy, we give the statute the appropriate narrow interpretation and, accordingly, the judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.

CAPLAN, Justice, dissenting:

I respectfully dissent from the majority opinion in this case. *W. Va. Code*, 1931, 7–14–15(a), as amended, prohibiting deputy sheriffs from engaging in any political activity of any kind, character, or nature whatsoever except voting is unconstitutionally overbroad and vague and should therefore be voided in its entirety.

The governmental interest in restricting political activities of classified employees has been well recognized. *United States Civil Service Commission v. National Ass'n. of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *United Public Workers of America v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Such restrictions are designed to insure meritorious performance of government service and to protect employees from improper political influence. *Mitchell, supra.* However permissible such restrictions may be, they must give adequate warning of what activity is proscribed, set forth specific standards for those who must apply it, *e.g.*: *Lanzetta v. New Jersey*, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939); *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926), and must not be so vague that "men of common intelligence must necessarily guess at [their] meaning." *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). It is undisputed that legislation must fall if its promotion of valid governmental interests is outweighed by its damage to expressive and associational interests. Statutes attempting to restrict the exercise of First Amendment rights must be narrowly drawn, representing a considered legislative judgment that particular expression must give way to other compelling needs of society. *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Herndon v. Lowry*, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066 (1937); *Grayned v. City of Rockford, supra.* Legislative prohibitions may not be too broad in their sweep and must distinguish between conduct that may be proscribed and conduct that must be permitted. Overbreadth and vagueness in the First Amendment area must be strictly curtailed because ambiguity and the broad sweep of a statute may inhibit citizens from exercising

their fundamental constitutional rights. When a statute or regulation impinges on the rights covered by the First Amendment, a greater degree of specificity is demanded. *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

To guard against the "chilling effect" overbroad legislation may have upon freedom of expression and association, the United States Supreme Court has developed certain standards that are exclusively or primarily applicable in First Amendment litigation. Generally, a person to whom a statute may constitutionally be applied will not have standing to challenge the statute on grounds of unconstitutional application to others in situations not before the court. See *e.g. United States v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). *United States v. Wurzbach*, 280 U.S. 396, 50 S.Ct. 167, 74 L.Ed. 508 (1930). The "as applied" method involves a judgment as to the constitutionality of a challenged statute based on the harm caused to the litigating party. It vindicates a claimant whose conduct is within the First Amendment but invalidates the challenged statute only to the extent of the impermissible application. But in the area of First Amendment rights, the court has altered its traditional rules of standing to permit "attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity. [cites omitted]." *Dombrowski v. Pfister*, 380 U.S. 479, at 486, 85 S.Ct. 1116, at 1121, 14 L.Ed.2d 22, at 28 (1965). This departure from the traditional method of judging the constitutionality of statutes is justified by the favored status of right to expression and association. The statutes very existence may cause others not before the court to refrain from constitutionally protected speech or expression. The doctrine emphasizes the need to eliminate an overbroad law's "chilling effect" by insisting on legislative judgment precisely drafted to express a definite policy thought sufficient to override expressive interests. Note, the First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970). Thus, "facial" overbreadth analysis

proceeds without regard to the constitutional status of the litigant's conduct. Under this approach, a statute prohibiting substantial activity protected by the First Amendment is voided entirely. The United States Supreme Court has noted its reluctance to apply the facial overbreadth test. The test set forth in *Broadrick, supra*, 413 U.S. at 615, 93 S.Ct. at 2917, is "... where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Likewise, in *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) there was an apparent narrowing of standing to assert vagueness when one is clearly within a valid proscription, the law's deterrent effect on legitimate expression is not "both real and substantial", and the law is "readily subject to narrowing construction by the state courts."

It is noted in *Broadrick, supra*, 413 U.S. at 613, 93 S.Ct. at 2916, that:

> Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute. See *Dombrowski v. Pfister*, 380 U.S., at 491 [85 S.Ct. at 1123]; *Cox v. New Hampshire*, 312 U.S. 569 [61 S.Ct. 762, 85 L.Ed. 1049] (1941); *United States v. Thirty-seven Photographs*, 402 U.S. 363 [91 S.Ct. 1400, 28 L.Ed.2d 822] (1971); cg. *Breard v. Alexandria*, 341 U.S. 622 [71 S.Ct. 920, 95 L.Ed. 1233] (1951).

The Court here is not merely involved in interpreting or construing the statute. The majority clearly has undertaken the task of judicial legislating.

In *Broadrick* and *Letter Carriers*, the statutes proscribing certain political activity were much more narrowly drawn than the statute before this Court. In determining that the political activity proscriptions were not impermissibly broad, the court, in those cases, looked not only to the specific language of the acts, but also to authoritative administrative pronouncements. *Broadrick* and *Letter Carriers* herald only narrow, carefully drawn exceptions.

*W. Va. Code*, 1931, 7–14–15(a), as amended, is not drawn with such narrow specificity. We recognize a significant government interest in regulating political activity of deputy sheriffs to promote efficiency, foster loyalty to superior officers, maintain morale, and instill public confidence in the law enforcement institution. To achieve these ends, regulations may be promulgated, but their restrictive effect may extend only as far as is necessary to accomplish a legitimate government interest. The narrowest means consistent with the furtherance of that interest must be employed. *W. Va. Code*, 1931, 7–14–15(a), as amended, regulates political activity in a much broader sweep and with less specificity than the Acts construed in *Broadrick* and *Letter Carriers*. If the Supreme Court can characterize the *Broadrick* statute, § 818 as "slightly overbroad," then Code 7–14–15(a) is clearly substantially overbroad. It prohibits the *universe* of a deputy sheriff's conceivable political activities except voting. None of the factors mentioned in *Broadrick* or *Letter Carriers* providing limitations or guidelines are found here. There are no limiting regulations; there is no body of doctrine; there is no office for interpretive guidance; and, most importantly, no judicial construction of the section can eliminate its overbreadth and also provide the requisite degree of clarity without transgressing into the legislative function. For these reasons, contrary to the expression of the majority, the section is unconstitutionally overbroad and vague and cannot be saved by judicial construction. See *Davis v. Williams*, 598 F.2d 916 (5th Cir., 1979); *Phillips v. City of Flint*, 57 Mich.App. 394, 225 N.W.2d 780 (1975); and *Alderman v. Philadelphia Housing Authority*, 496 F.2d 164 (3rd Cir. 1974).

It is very clear that the legislature intended to strictly regulate the political activities of deputy sheriffs. *Mitchell* makes it clear that this is a valid exercise of legislative authority. The legislature, not this Court, is entrusted with the duty of balancing the extent of the guarantees of freedom against the need for orderly management, integrity and competency of classified employees. A wholesale ban on

*all* political activity does not meet the standards of precision necessary in drafting restrictions on First Amendment rights. There is no apparent attempt by the legislature to balance a deputy sheriff's right to participate in political expression against the government's interest in maintaining non-political law enforcement. The proper inquiry is a balancing of government needs and private rights. A rewriting of *W. Va. Code*, 1931, 7–14–15(a), as amended, must be based on a detailed determination of what dangers the State seeks to control and of what rights it must guarantee. Such task is a valid exercise of legislative, not judicial, authority.

*W. Va. Code*, 1931, 7–14–15(a), as amended, prohibiting deputy sheriffs from engaging in any political activity of any kind, character, or nature whatsoever except voting is unconstitutionally overbroad and vague and should therefore be voided in its entirety.

MILLER, Justice, concurring:

While I concur with the result reached in this case, I disagree with the approach engendered by the doctrine of the least obtrusive remedy.

The doctrine of the least obtrusive (or intrusive) remedy has been applied by this Court on four previous occasions in order to provide relief on constitutional grounds in a manner that would not require invalidating a statutory provision in its entirety. In none of these instances, however, has the "doctrine" been employed by this Court to justify a statutory construction by which the Court inserts into the statute a detailed definition of a key statutory phrase and then applies the enumerated details, retrospectively, to the case before the Court.

In *State ex rel. Alsop v. McCartney*, 159 W.Va. 829, 228 S.E.2d 278 (1976), the Court considered a challenge to a particular ballot provision which unconstitutionally discriminated against independent candidates. Rather than strike the statute, the Court, in establishing the doctrine of the least obtrusive remedy, announced that it would simply require ballot access in the appropriate case.

In *State ex rel. Harris v. Calendine,* 160 W.Va. 172, 233 S.E.2d 318 (1977), we applied the doctrine to the West Virginia juvenile commitment provisions which unconstitutionally failed to distinguish between status offenders and criminal offenders. Instead of invalidating the statute, the Court set forth the constitutional principles under which the application of the statute must be limited.

Similarly, in *Waite v. Civil Service Commission,* 161 W.Va. 154, 241 S.E.2d 164 (1977), the Court upheld a temporary suspension provision so long as its application included minimal due process protections.

Finally, in *State ex rel. Whitman v. Fox,* 160 W.Va. 633, 236 S.E.2d 565 (1977), the Court applied the doctrine to support the proposition that, where possible, the Court would strike only the unconstitutional portion of a statute rather than invalidating an unconstitutional statute as a whole.

The doctrine of the least obtrusive remedy, expressed as such, does not appear to be discussed by other state courts or by the federal courts. The doctrine, however, may be little more than a corollary of the familiar and widespread principle that statutes should be construed whenever possible so as to avoid a ruling of unconstitutionality. *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Civil Service Commission v. Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *United States v. Vuitch,* 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971). This principle was expressed by this Court in Syllabus Point 1 of *State ex rel. Kanawha County Bldg. Commission v. Paterno,* 160 W.Va. 195, 233 S.E.2d 332 (1977):

" 'When the constitutionality of a statute is challenged, every reasonable construction must be resorted to by the courts to sustain its validity and any reasonable doubt must be resolved in favor of the constitutionality of the legislative act in question.' Syllabus point 1,

*State ex rel. West Virginia Housing Development Fund v. Waterhouse,* 158 W.Va. 196, 212 S.E.2d 724 (1974)."

*See also State v. Flinn,* 158 W.Va. 111, 208 S.E.2d 538 (1974); *State ex rel. City of Charleston v. Coghill,* 156 W.Va. 877, 207 S.E.2d 113 (1973); *State ex rel. Hughes v. Board of Education,* 154 W.Va. 107, 174 S.E.2d 711 (1970), *cert. denied,* 403 U.S. 944, 91 S.Ct. 2274, 29 L.Ed.2d 854 (1971).

The difficulty with the majority's solution in the present case is that it is not merely resolving an ambiguity in favor of a constitutional result, or applying a constitutional principle to limit a statute's scope, but is instead inserting into a statutory framework definitional detail that does not exist. Although this detail is approved by the United States Supreme Court in *Civil Service Commission v. Letter Carriers,* 413 U.S. 548, 37 L.Ed.2d 796, 93 S.Ct. 2880 (1973), it is important to note that in *Letter Carriers,* the Court was not supplying statutory detail, but was approving the enumerated list of political activities that the statutory framework already contained.[1]

This distinction is significant for several reasons. First, in *Letter Carriers,* unlike the present case, the Supreme Court was not drafting statutory details in a manner more properly exercised by a legislature or regulatory commission, but was utilizing the pre-existing regulations to supplement the statutory language. It found that the statute, as complemented by the regulations, provided a constitutionally sufficient framework whereby an employee could ascertain a definitive standard and conform his conduct so as to avoid participating in prohibited activity. Moreover, it is clear from *Letter Carriers* that the statute and its regulations were complementary and contemporaneously existing. The involved employee, therefore, had prospective guidelines to govern his conduct.

---

1. The statute in question, 5 U.S.C. § 7324, proscribed federal civil service employees from taking "an active part in political management or in political campaigns." The statute incorporated the then existing rules and regulations of the Civil Service Commission to provide the specif-

ics of what constitutes proscribed activities. The Civil Service regulations which were in effect at the time of *Letter Carriers* and were approved by that decision contained some thirteen prohibited activities. 5 C.F.R. § 733.122(b).

In the present case, however, the delineation of proscribed activity has been established on appeal, and applied retroactively to an employee who could not, at the time, have envisaged the future details of the act he is charged with violating. The problem of retroactive application of these details is particularly acute in the present case where the deputy's activity was not so extreme that formulations differing in detail would not produce different results.

In *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), a companion case to *Letter Carriers*, the United States Supreme Court upheld Oklahoma's prohibition of political activity among state civil service employees against a challenge that the statutory prohibition was unconstitutionally vague and broad.[2] In support of the constitutionality of the prohibition, the Court noted that the Rules of the State Personnel Board and opinions of the State Attorney General helped provide the definitional detail that spared the provision from unconstitutional vagueness and overbreadth.

I would resolve this case on the basis of *Broadrick* and *Letter Carriers*, since there are longstanding opinions of the West Virginia Attorney General detailing proscribed political activity for civil servants. Although there are no Attorney General opinions directly relating to the deputy sheriff statute, its statutory language restraining political activity is identical, in its relevant parts, to the statutory language restraining political activity for both fire department employees and city police who are under civil service.[3]

Under the police provision, W.Va.Code, 8–14–19, and the fire department provision, W.Va.Code, 8–15–24, the Attorney General has set forth, in a 1966 opinion, an itemization of the political activity prohibited by these provisions:

"We have concluded the following activities to be prohibited as 'political activity' on the part of a police officer or a member of a fire department of any municipality governed by civil service rules: Serving as an election officer; serving on any political party committee; serving as a poll watcher, challenger or checker; soliciting support for a candidate; soliciting campaign contributions; circulating leaflets, circulars, and other advertising material; organizing political meetings; transporting voters to register on behalf of a political party; transporting voters to the polls on behalf of candidates seeking election; expressing political views at caucuses, conventions or other political gatherings; participating in political parades; canvassing for signatures on party nominating committees serving as delegates to conventions; placing in nomination a candidate at a convention; and serving as an officer at a convention or on convention committees.

"But there are certain things which we believe that a municipal police officer or a fireman may properly do ... such as casting a ballot at the primary or general elections; attending, as a spectator, polit-

---

**2.** The Oklahoma statute in its material part stated:

"No employee in the classified service shall be a member of any national, state or local committee of a political party, or an officer or member of a committee of a partisan political club, or a candidate for nomination or election to any paid public office, or shall take part in the management or affairs of any political party or in any political campaign, except to exercise his right as a citizen privately to express his opinion and to cast his vote." Okla.Stat.Ann. tit. 74, § 818.

**3.** W.Va.Code, 7–14–15(a), relating to deputy sheriffs:

"[N]o deputy sheriff covered by the provisions of this article shall engage in any political activity of any kind, character or nature whatsoever, except to cast his vote at any

election or shall act as an election official in any municipal, county or state election."

W.Va.Code, 8–15–24, relating to fire department employees:

"No member of any paid fire department shall engage in any political activity of any kind, character or nature whatsoever, except to cast his vote at any election, or shall act as an election official in any election, municipal, county or state."

W.Va.Code, 8–14–19(a), relating to city police:

"No member of any paid police department of a Class I or Class II city shall engage in any political activity of any kind, character or nature whatsoever, except to cast his vote at any election, or shall act as an election official in any election, municipal, county or state."

ical rallies, dinners, etc., without any active participation therein; expressing private political views, but not at political gatherings or for the purpose of soliciting support or funds for the aid of any candidate or political party. We are of the view that civil service covered municipal policemen and firemen may also vote as individuals for nominees in a political convention." 51 Op. Att'y Gen. 780, 782–83 (1966).

Further Attorney General opinions regarding the political activity of civil servants include Op. Att'y Gen., Jan. 23, 1976 (permitting lobbying); Op. Att'y Gen., Dec. 18, 1975 (excluding chief deputy from coverage); 52 Op. Att'y Gen. 571 (1968) (disallowing leave of absence in order to engage in otherwise prohibited political activity).

Because of the substantial identity of the provisions disallowing political activity for deputy sheriffs, city police, and fire department employees, the Attorney General's opinions provide appropriate guidance for determining the scope of prohibited political activity for deputy sheriffs. These Attorney General guidelines provide the type of detail that the United States Supreme Court, under *Broadrick v. Oklahoma*, would permit to save the general statutory prohibition from vagueness and overbreadth.

Since the detailed itemization in 51 Op. Att'y Gen. 780 was set forth in 1966, this list provides the guidelines that were in effect at the time of the alleged violations in the present case. It is this list of political prohibitions that should be applied to the deputy's activity, rather than imposing, retroactively, the judicially created detail in the majority opinion.

I am authorized to state that Justice HARSHBARGER joins me in this concurrence.

McGRAW, Justice, dissenting:

For the reasons stated in the ultimate paragraph of Justice Caplan's dissenting opinion, I also dissent.